20 F.3d 926
 UNITED STATES of America, Appellee,
v.
Ronald Larry MILLER, also known as Owen Whidby, also known
as Alex Martin, also known as James Pauly, also
known as Danny Galt, also known as
William Laslo, Appellant.
 No. 93-3224.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 11, 1994.
Decided April 6, 1994.
 
 Daniel O. Herrington, Kansas City, MO, argued, for appellant.
 David TeTar Newbert, Asst. U.S. Atty., Kansas City, MO, argued (Marietta Parker, U.S. Atty., on the brief), for appellee.
 Before RICHARD S. ARNOLD, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and HANSEN, Circuit Judge.
 RICHARD S. ARNOLD, Chief Judge.
 
 
 1
 The defendant, Ronald Larry Miller, after entering a conditional plea of guilty, was convicted of being a felon in possession of a firearm, a violation of 18 U.S.C. Sec. 922(g). He was sentenced under 18 U.S.C. Sec. 924(e), which provides a fifteen-year-minimum sentence for a Sec. 922(g) violation when the defendant has three prior violent or drug-related felonies.
 
 
 2
 Miller, acting both through counsel and pro se, appeals his conviction and sentence on the basis of several theories; three of them deserve discussion. First, Miller claims that the weapon he is charged with possessing was discovered during an automobile search which violated the Fourth Amendment and that the gun should have been excluded from evidence. Second, he contends that his due-process rights were violated by a 27-month delay between his arrest and indictment on the Sec. 922(g) charge. Third, he asserts that, in enhancing his sentence, the District Court[1] wrongly relied on certain bank-robbery convictions obtained in violation of the then-applicable Federal Youth Corrections Act, 18 U.S.C. Sec. 5005 et seq. (repealed by Pub.L. No. 98-473, Sec. 218(a)(8), 98 Stat. 2027 (1984)). We affirm.
 
 I.
 
 3
 Many of the facts in this case are not in dispute. On March 26, 1990, Officer Larry Drunert of the Missouri State Highway Patrol pulled over the defendant in Benton County, Missouri. Officer Drunert followed the defendant 100 to 200 yards up a private driveway until Miller stopped, at which point Drunert approached Miller's car and asked to see a driver's license. Miller handed Drunert a handwritten, photo-less, temporary Tennessee driver's license in the name "Owen Eckard Whidby."[2] Miller also produced a handwritten application, bearing the name "William Laslo," for the car's certificate of title and registration. In response to Drunert's request for more identification, Miller presented a social security card, labeled "Owen E. Whidby." At that point, Drunert either asked to see the contents of Miller's wallet, or, as Miller contends, the wallet itself. Miller complied, and the officer received three Oklahoma driver's licenses, each with a different name and date of birth, but each bearing a photo of the defendant. Drunert then asked to search the car.
 
 
 4
 After obtaining back-up from the local sheriff's department, Officer Drunert began a search of the vehicle. In the trunk he found lock picks and numerous other burglary tools. At this point, he arrested Miller and advised him of his Miranda rights. More burglary tools were found in the trunk, as well as materials for making false drivers' licenses and other forms of identification. In addition, the trunk contained handwritten notes on how to crack safes, how to produce explosives, and how to carry out "scams." In the passenger compartment, the search revealed a pry bar, a slim-jim, and a lock puller. Finally, in the back seat, behind the driver's seat, investigators found a shaving kit containing a .22 Smith and Wesson revolver, loaded with bullets which matched three later found in Miller's pants pocket.
 
 
 5
 Miller was then taken to the Benton County Sheriff's Department. His true identity was established through his fingerprints, and the authorities ascertained that he was wanted on two federal warrants, one for a federal parole violation, the other for armed robbery in Oklahoma. On June 14, 1990, Miller was returned to the federal penitentiary at Leavenworth as a parole violator.
 
 
 6
 State charges resulting from the defendant's March 26, 1990, arrest were dismissed on July 2, 1990. A federal indictment charging defendant with being a felon in possession was returned on June 10, 1992. Pre-trial motions were addressed in a three-day evidentiary hearing and by a Report and Recommendation prepared by a magistrate judge.[3] Defendant's requests for relief were denied. Miller entered a conditional guilty plea, preserving his right to challenge the magistrate judge's rulings on his Fourth and Fifth Amendment claims. The District Court adopted the Report and Recommendation, and Miller was sentenced to 15 years in prison. This appeal followed.
 
 II.
 
 7
 Miller claims that his Fourth Amendment rights were violated during the stop, search, and arrest. He argues that the officer's traffic stop was pretextual, that Officer Drunert lacked sufficient grounds for asking him to reveal the contents of the wallet, and that he never granted Drunert permission to search the car, or, if he did, his action was involuntary. On the basis of these contentions, Miller contends that the gun was inadmissible as fruit of an illegal search. Without the gun, the possession charge would have to be dismissed. We briefly discuss each argument in turn.
 
 
 8
 Miller and the United States offer different versions of the initial traffic stop. Officer Drunert's account was that Miller was traveling between 30 and 40 miles per hour on the highway, below the speed limit, causing traffic to back up four or five cars deep. Drunert testified that, after following Miller for a minute or so, he turned on his lights to pull him over for impeding traffic. Drunert stated that his sole reason for stopping Miller was the traffic violation.
 
 
 9
 The defendant, on the other hand, tried to establish that Drunert suspected that the driver was Miller, that Drunert knew Miller to be the subject of arrest warrants, and that, therefore, the claim that Miller was impeding traffic was merely a pretext for the stop. Miller maintained that Drunert was actually going the opposite direction on the highway, and made a U-turn to pull him over, with just one car behind Miller (and another in front). The defendant drew attention to the lack of evidence of any written traffic citation, as well as Drunert's acknowledgement that the state police had received an anonymous tip, prior to the traffic stop, that parole violator Miller was in the area. Miller also made much of ambiguous comments Drunert had made to a police officer from Pryor, Oklahoma.
 
 
 10
 Whether a traffic stop is pretextual, thus requiring suppression of the resulting evidence, is a question of fact subject to review only for clear error. United States v. Richards, 967 F.2d 1189, 1192 (8th Cir.1992) (citing United States v. Portwood, 857 F.2d 1221, 1223 (8th Cir.1988), cert. denied, 490 U.S. 1069, 109 S.Ct. 2073, 104 L.Ed.2d 638 (1989)). The stop is measured against a standard of "objective reasonableness." United States v. Cummins, 920 F.2d 498, 501 (8th Cir.1990), cert. denied, --- U.S. ----, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991) (quoting Scott v. United States, 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978)). In this case, the magistrate judge credited Officer Drunert's version of the traffic stop over Miller's.[4] Moreover, she observed that driving too slowly and impeding traffic violates Missouri law, despite the absence of a minimum speed limit. Mo.Rev.Stat. Sec. 304.011 (1992).
 
 
 11
 Having reviewed the record, we cannot say that the District Court clearly erred in believing Drunert's account. Even assuming Drunert was looking for Miller, it would be "objectively reasonable" to pull over a vehicle which was causing a four-to-five car backup on a state highway. "When an officer observes a traffic offense--however minor--he has probable cause to stop the driver of the vehicle." Cummins, 920 F.2d at 500. The District Court rightly rejected Miller's challenge to the validity of the stop.
 
 
 12
 Miller also contends that Drunert lacked suspicion adequate to allow the traffic stop to evolve into an investigative stop. In order for such a stop to be reasonable, it must be based on specific, articulable facts and rational inferences drawn from those facts. See Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879-80, 20 L.Ed.2d 889 (1968).
 
 
 13
 At the suppression hearing, Drunert testified that he asked to see the contents of Miller's wallet after receiving Miller's paper identification (which included different names for the license and car registration), observing Miller's nervousness (including shaking hands), and watching Miller's apparent attempts to hide the contents of his wallet. Drunert also asserted that he saw what appeared to him to be additional plastic cards in the wallet--perhaps more driver's licenses. The cards turned out to be three false Oklahoma licenses, leading to further investigation. Nervousness alone does not constitute reasonable grounds for suspicion, United States v. Tapia, 912 F.2d 1367, 1371 (11th Cir.1990), but the facts cited by Drunert, taken together as a whole, provided ample justification for the limited additional request to see the contents of Miller's wallet.
 
 
 14
 Miller also contends that he did not consent to Drunert's search of his car, and, that even if he did, his consent was invalid because he was detained. Turning first to the issue of consent, we note that police officers may search an area, even without probable cause or a warrant, if someone with adequate authority has consented to the search; prosecutors must demonstrate voluntariness by a preponderance of the evidence. United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974); Schneckloth v. Bustamonte, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973); United States v. Chaidez, 906 F.2d 377 (8th Cir.1990). In assessing voluntariness, courts look both to the characteristics of the accused and the details of the environment. Bustamonte, 412 U.S. at 226, 93 S.Ct. at 2047; Chaidez, 906 F.2d at 380-81 (listing relevant aspects of each). We review the District Court's consent determination under the clearly erroneous standard. United States v. Archer, 840 F.2d 567, 573 (8th Cir.), cert. denied, 488 U.S. 941, 109 S.Ct. 364, 365, 102 L.Ed.2d 354 (1988).
 
 
 15
 After he received the additional licenses, Drunert testified that he asked whether the car contained anything illegal, and that Miller replied it did not. Next, the officer said he asked the defendant whether he could search the car and the contents therein, and that Miller gave his permission. Finally, Officer Drunert stated that he asked if everything in the car belonged to Miller, and that Miller answered in the affirmative. Miller, on the other hand, maintains that none of this happened the way Drunert says it did. Most importantly, Miller claims he never responded to Drunert's request for permission to search, and therefore never consented. The magistrate judge credited Officer Drunert's story, thus finding permission granted, and nothing in the record suggests that we should reverse the District Court on this point.
 
 
 16
 The magistrate judge then considered the voluntariness of Miller's consent, in light of Chaidez. The judge acknowledged that Miller was nervous and had not been warned that he could refuse consent. The judge also noted, but did not explicitly accept or reject, Miller's testimony that he had been inside the patrol car when Drunert sought the permission to search, and Miller's (belated) claim to have been handcuffed then, as well. The magistrate judge emphasized that the forty-year-old Miller was not intoxicated during the stop, possessed a high-school education, had been through multiple prior dealings with the criminal justice system, and had taken a paralegal course while in prison--he even represented himself and conducted examinations during the hearing. Furthermore, the judge found no physical abuse of Miller, nor any promises or misrepresentations by the officer, and that consent had been given shortly after the stop was made. Thus, the magistrate judge concluded that, under all the circumstances, Miller's consent was voluntary.
 
 
 17
 Miller argues that, because Drunert possessed his (bogus) identification, he justifiably believed that he was not free to leave, see Michigan v. Chesternut, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) and United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), and that, therefore, his consent could not have been voluntary. However, this Court recently stated that "even persons who have been arrested and are in custody can voluntarily consent to a search...." Chaidez, 906 F.2d at 382, citing United States v. Watson, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976). Miller's invocation of this Court's decision in United States v. Jefferson, 906 F.2d 346 (8th Cir.1990), is unavailing, because in that case evidence yielding articulable grounds for suspicion (a discrepancy between the driver's identification and a vehicle's car-rental contract) was not discovered until after an unreasonable seizure had occurred. Id. at 347. Here, we have already concluded that Drunert had sufficient grounds to stop Miller and ask to see the contents of the wallet. Once he found the additional licenses, it was reasonable to seek permission to search further. The District Court's finding that Miller's consent to the search was voluntary is not clearly erroneous.
 
 III.
 
 18
 The defendant next claims that the charge against him should be dismissed because of the 27-month delay between his arrest and his indictment. At the hearing, the magistrate judge rejected Miller's claim that the now-deceased brother of a one-time fellow inmate, Benny Montgomery, could have offered exculpatory evidence as to ownership of the automobile and gun had Miller been indicted earlier. Now Miller has abandoned his "Benny Montgomery" defense, but claims pre-indictment delay led to a loss of documents and other materials, and reduced his ability to cross-examine Officer Drunert effectively on the legality of the stop and arrest.
 
 
 19
 In order to establish a Fifth Amendment due-process violation resulting from pre-indictment delay, this Court requires defendants to prove that the delay was unreasonable and that it actually and substantially prejudiced the presentation of their defense. United States v. Savage, 863 F.2d 595, 598 (8th Cir.1988), cert. denied, 490 U.S. 1082, 109 S.Ct. 2105, 104 L.Ed.2d 666 (1989). Under this standard, a showing of actual prejudice must first be established; if it is, the court will then inquire into the reasons for the delay and balance those reasons against the demonstrated prejudice. Ibid.; United States v. Lovasco, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1987). See also United States v. Bartlett, 794 F.2d 1285, 1289 (8th Cir.), cert. denied, 479 U.S. 934, 107 S.Ct. 409, 93 L.Ed.2d 361 (1986).
 
 
 20
 Miller argues that he was prejudiced by the delay in two ways. First, he claims that he would have used certain police records in his cross-examination of Officer Drunert, but they were destroyed before Miller was indicted. For example, Miller maintains that the arrest record did not mention a slow-driving infraction, and that any record of a written citation has since been destroyed. He also asserts that now-destroyed radio logs would have reflected if and when Officer Drunert asked for a check on the driver's licenses and other documentation. Second, Miller claims that the march of time eroded Officer Drunert's memory so severely that the defendant was prevented from effectively cross-examining Drunert on several points: the source of the anonymous tip on Miller's whereabouts, where Drunert stood while requesting a computer check on the licenses, whether Drunert requested the wallet while they were seated in the patrol car, and whether Miller was handcuffed when Drunert asked for consent to the search. Because Miller points to specific junctures at which time may have been his adversary, his claim of actual prejudice is better than some. Indeed, Drunert admitted that he had to rely on his arrest report because it had been so long since the event. However, Miller's claim withers upon closer scrutiny.
 
 
 21
 To begin with, a significant portion of the 27-month delay was due to legitimate investigative needs.[5] See United States v. Taylor, 603 F.2d 732, 735 (8th Cir.), cert. denied, 444 U.S. 982, 100 S.Ct. 487, 62 L.Ed.2d 410 (1979) (citing Lovasco, 431 U.S. at 796, 97 S.Ct. at 2052, and United States v. Hood, 593 F.2d 293, 296 (8th Cir.1979)). At the end of such delay, in the normal course of events, many, if not most of the relevant materials would have been lost,[6] and memories would already have considerably eroded. How much less Drunert remembered because of the additional delay is mere speculation.
 
 
 22
 Second, and more importantly, even if Officer Drunert possessed perfect recall, and even if Miller had been able to secure all the written materials he says he needed, in light of our discussion in Section II of this opinion, we seriously doubt Miller could have established any violation of his Fourth Amendment rights. One exception is that, if Miller had established that Drunert handcuffed him before asking for permission to search, we would have a harder time finding consent. However, even if Miller had cross-examined Drunert the day after the stop, it is extremely unlikely he could have proved that Officer Drunert restrained him before the formal arrest. First, prior to the evidentiary hearing, Miller filed papers alleging a Fourth Amendment violation, but did not mention handcuffs until the suppression hearing began. Second, Drunert was pretty firm in denying handcuffs were used, even if he was not 100% certain.
 
 
 23
 The slight possibility that Miller could have established a Fourth Amendment violation, but for the lengthy pre-indictment delay, falls well short of "actual prejudice." Miller's Fifth Amendment challenge to the conviction fails.
 
 IV.
 
 24
 Finally, the defendant challenges the enhancement of his sentence under 18 U.S.C. Sec. 924(e). Miller's enhancement was based on the presentence report (PSR), which indicated that he was convicted of multiple bank-robbery charges in the District of Utah in 1969 and of extortion in the Northern District of Oklahoma in 1980; the Utah convictions, obtained when the defendant was nineteen, covered a series of armed robberies committed throughout the West.
 
 
 25
 In essence, Miller attacks the validity of the 1969 bankrobbery convictions on two grounds. First, he claims his guilty plea was invalid because, during his plea hearing, he was not fully apprised of his rights with respect to possible alternative sentencing under the Federal Youth Corrections Act, 18 U.S.C. Sec. 5005 et seq., since repealed. Miller augments his own version of events with an affidavit from a relative. The District Court declined to credit either account. Miller also points to questions asked by the Utah judge at sentencing, which might be taken to indicate that penalties had not been discussed in the plea hearing.
 
 
 26
 We conclude that Miller's claim of an invalid plea is without merit. To begin with, we agree with the District Court that it makes no sense for Mr. Miller to contend that he would not have pleaded guilty had he known that it was possible he could receive a more lenient sentence. Second, the defendant bears the burden of proving the invalidity of a prior conviction based on a guilty plea. United States v. Day, 949 F.2d 973, 982-83 (8th Cir.1991). When the relevant record is missing or nonexistent, as is the case here, the presumption is that the actions of a court of competent jurisdiction are correct. Parke v. Raley, --- U.S. ----, ----, 113 S.Ct. 517, 523, 121 L.Ed.2d 391 (1992). We agree that the defendant has failed to overcome this presumption.
 
 
 27
 Miller's second contention is that the sentence he received from the Utah court is invalid because that court did not explicitly consider alternative sentencing under the Youth Corrections Act, as required by Dorszynski v. United States, 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974). This decision was rendered after Miller was sentenced. While we have ruled that Dorszynski operates retroactively, the Tenth Circuit, where the bank-robbery convictions occurred, has concluded that it does not, Jackson v. United States, 510 F.2d 1335, 1337 (10th Cir.1975), and its law prevails here. See United States v. Gipson, 985 F.2d 412, 414 (8th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 81, 126 L.Ed.2d 50 (1993) (quoting 18 U.S.C. Sec. 921(a)(20)). This sort of omission, moreover, is hardly serious enough to subject a conviction to collateral attack. The District Court properly sentenced Mr. Miller under Sec. 924(e).
 
 V.
 
 28
 For the foregoing reasons, the District Court's judgment is affirmed.
 
 
 
 [1]
 The Honorable Howard F. Sachs, Senior United States District Judge for the Western District of Missouri
 
 
 [2]
 In addition, the license had expired, although evidently Officer Drunert was not aware of this until the Court pointed it out. During his testimony, Drunert referred to the license as an application
 
 
 [3]
 The Honorable Sarah W. Hays, United States Magistrate Judge for the Western District of Missouri
 
 
 [4]
 The District Court agreed, stating that, "based in part on defendant's high motivation to give false testimony, his record, and the massive collection of false identifications ... [i]t would stretch credulity to accept defendant's version of events which are so fateful for his future." Mem. and Order at 2
 
 
 [5]
 At a bare minimum, the March, 1990, through September, 1990, portion of the delay, to allow the investigation of a bank robbery with which Miller had been linked, and the April, 1991, through November, 1991, portion, for the investigation of the firearms charge, were legitimate investigatory delays, totaling twelve months. At least another month or two should be allotted for the U.S. Attorney to prepare the case. This totals fourteen months. The remaining periods of delay appear to be due to administrative delays, inertia, or at worst negligence. We agree with the magistrate's finding that "there was absolutely no evidence that the delay was for strategic reasons...." Report and Recommendation at 7
 
 
 [6]
 Drunert testified that he disposes of his daily notes every day or so after preparing arrest reports. He also testified that records of written citations are destroyed after 90 days. Radio logs are discarded after thirteen months