Richard **BENNETT**, Appellant,

v.

A.L. **LOCKHART**, Director, Arkansas Department of Corrections, Appellee.

No. 94–1215.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 15, 1994.

Decided Nov. 2, 1994.

---

W. Asa Hutchinson, Fort Smith, AR, argued, for appellant.

Pamela Rumpz, Little Rock, AR, argued, for appellee.

Before HANSEN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

In 1978, Marcia Bennett drowned in the Arkansas River near Paris, Arkansas. At the time, she and her husband of three months, Richard Bennett, were fishing from a bridge at night. They had come to Arkansas from Ohio to buy land for a local business. According to Mr. Bennett, he first threw a rope to his wife after she fell; he then jumped into the water but was unable to find her. Nine days later, her body floated to the surface, where it was found. The police questioned Mr. Bennett but closed their investigation in 1980, after the local prosecuting attorney decided not to prosecute him.

In mid–1987, nine years later, the state (in the person of a successor local prosecuting attorney) charged Mr. Bennett with the murder of his wife. (In early 1987, other members of Mrs. Bennett's family had obtained a civil judgment against Mr. Bennett for her wrongful death.) Mr. Bennett was convicted by a state court jury in 1988, but the Arkansas Supreme Court reversed that conviction (depositions were used as prosecution evidence even though no showing of unavailability of the deponents was made). *See Bennett v. State,* 297 Ark. 115, 759 S.W.2d 799, 803–04 (1988). A second state court jury convicted Mr. Bennett in 1989, but the Arkansas Supreme Court reversed that conviction as well (jury instructions were given at the beginning and not at the end of the trial). *See Bennett v. State,* 302 Ark. 179, 789 S.W.2d 436, 438–40 (1990), *cert. denied,* 498 U.S. 851, 111 S.Ct. 144, 112 L.Ed.2d 110 (1990).

In 1991, after a three-day trial, a third state court jury convicted Mr. Bennett for the murder of his wife and sentenced him to life imprisonment. On appeal, the Arkansas Supreme Court affirmed that conviction. *See Bennett v. State,* 308 Ark. 393, 825 S.W.2d 560, 561, 564 (1992).

Mr. Bennett petitioned for habeas corpus relief under 28 U.S.C. § 2254 in federal district court in mid–1992. The petition was referred to a magistrate judge. *See* 28 U.S.C. § 636(b)(1)(B). The magistrate judge filed a report about a year later, recommending that the petition be denied. In late 1993, the district court adopted the report and recommendations of the magistrate judge.

Mr. Bennett appeals the denial of his habeas petition. He contends that he was denied due process by the nine-year delay between his wife's death and the filing of charges against him, that he was denied a fair and impartial jury trial by the inclusion on the jury of a juror who did not meet the statutory requirements for jury service in his case, that he was denied the effective assistance of counsel by the state trial court's refusal to allow his lawyer to argue a question related to the introduction of certain evidence, that a statement that he made to the police was improperly admitted, that he was denied due process by various evidentiary rulings of the state trial court, that the evidence was constitutionally insufficient for a conviction, and that he is actually innocent. We affirm the district court.[1]

I.

Mr. Bennett asserts that he was prejudiced by the nine-year delay between Mrs. Bennett's death and the filing of charges against him to such an extent that he was deprived of due process. *See, e.g., United States v. Lovasco*, 431 U.S. 783, 790, 97 S.Ct. 2044, 2048–49, 52 L.Ed.2d 752 (1977). To prevail in this circuit on a claim of violation of due process on account of delay in charging a suspect, the aggrieved person must "prove that the delay was unreasonable and that it actually and substantially prejudiced the presentation of [the] defense.... Under this standard, a showing of actual prejudice must first be established; if it is, the court will then inquire into the reasons for the delay and balance those reasons against the demonstrated prejudice." *United States v. Miller*, 20 F.3d 926, 931 (8th Cir.1994), *cert.*

*denied,* — U.S. ——, 115 S.Ct. 226, 130 L.Ed.2d 152 (1994).

"To prove actual prejudice, [the aggrieved person] must specifically identify witnesses or documents lost during delay properly attributable to the government.... The [aggrieved person] also must relate the substance of the testimony which would be offered by the missing witnesses or the information contained in lost documents in sufficient detail to permit a court to assess accurately whether the information is material to the accused's defense.... Finally, the [aggrieved person] must show that the missing testimony or information is not available through substitute sources.... In sum, the [aggrieved person] must demonstrate that the prejudice *actually* impaired his ability to meaningfully present a defense" (emphasis in original). *United States v. Bartlett*, 794 F.2d 1285, 1289–90 (8th Cir.1986), *cert. denied,* 479 U.S. 934, 107 S.Ct. 409, 93 L.Ed.2d 361 (1986). Mr. Bennett contends that the delay in filing charges against him allowed the loss of the fishing equipment that he and his wife were using on the night of her death, the rope that he says that he threw to his wife, and a ring (evidently belonging to Mrs. Bennett) that he asserts that he gave to the sheriff's office (all apparently misplaced by the sheriff's office).

Mr. Bennett argues that the fishing equipment would have corroborated his account of the events surrounding his wife's death. He also argues that the fishing equipment would have contradicted testimony of the deputy sheriff (we identify witnesses by their title at the time of Mrs. Bennett's death) that one of the fishing rods was not "rigged for fishing" but had been "reeled in." As the magistrate judge pointed out, however, it has never been disputed that the Bennetts were fishing shortly before Mrs. Bennett drowned (the state's theory was that Mr. Bennett pushed his wife off the bridge and then walked into the water himself from the shore and drowned her). We fail, therefore, to see what prejudice accrued to Mr. Bennett by the loss of the fishing

---

**1.** The Honorable Jimm Larry Hendren, United States District Judge for the Western District of Arkansas, adopting the report and recommenda-tions of the Honorable Beverly R. Stites, United States Magistrate Judge for the Western District of Arkansas. *See* 28 U.S.C. § 636(b)(1)(B).

equipment. *See, e.g., United States v. Bartlett,* 794 F.2d at 1290.

With respect to the rope, Mr. Bennett argues that it also would have corroborated his version of the events. The deputy sheriff testified, however, that the rope was found exactly where Mr. Bennett said it would be. We fail, then, to see what prejudice accrued to Mr. Bennett by the loss of the rope itself. *See, e.g., id.* In addition, since Mr. Bennett offers no explanation of the significance of the missing ring, we reject his suggestion that its loss was prejudicial to him.

■ Mr. Bennett also contends that the delay in filing charges against him allowed the loss of two witnesses who died during the interim—first, the person who issued fishing licenses to him and Mrs. Bennett and, second, a lawyer who assisted Mr. Bennett in local land transactions. Because it has never been disputed that the Bennetts were fishing on the night in question, however, we reject the contention that the loss of the testimony of the person who issued the fishing licenses prejudiced Mr. Bennett. According to Mr. Bennett, the lawyer would have testified that Mr. Bennett had a "legitimate" purpose for the trip to Arkansas and that the trip had been preceded by "long term planning"; the lawyer also would have testified about the demeanor of the Bennetts shortly before the night in question, about the tangible evidence at the scene on the morning after Mrs. Bennett's death, and about Mr. Bennett's "total .cooperation" in the investigation, including his willingness to take a polygraph test.

At trial, the state introduced, unchallenged, a statement that Mr. Bennett gave to a state police investigator three months after his wife's death. In that statement, Mr. Bennett related that he had been looking for property outside Ohio for about six months before his wife's death, that he had contacted the local lawyer about two months before his wife's death and had talked with a realtor and a bank as well, and that he had talked with the lawyer and several building contractors on the day before his wife's death. The state police investigator himself testified that Mr. Bennett "cooperated and gave ... [the] statement" after "voluntarily" coming to the police department and answering questions

and that there was "nothing that [Mr. Bennett] refused to answer." The sheriff testified, similarly, that Mr. Bennett "did what I asked him to do" and "answered my questions" the day after Mrs. Bennett's death. The state also introduced, unchallenged, photographs of the scene at the time Mrs. Bennett's body was found. Mr. Bennett has not alleged that the scene was different on that day from the day the lawyer was there.

In our view, the testimony of the local lawyer would have been cumulative to other evidence with respect to all of the topics specified by Mr. Bennett except the demeanor of the Bennetts shortly before the night in question. We decline, therefore, to find that the loss of testimony on those topics (except for the one specified) was prejudicial to Mr. Bennett. *See, e.g., United States v. Bartlett,* 794 F.2d at 1290. While testimony on the Bennetts' demeanor might have been useful, furthermore, we do not believe that its loss was so prejudicial as to have had an "actual[ ] and substantial[ ]" effect, *United States v. Miller,* 20 F.3d at 931, on the presentation of Mr. Bennett's defense.

The local lawyer was also present during two interviews with Mr. Bennett by police officers; Mr. Bennett does not, however, specify whether or in what way the lawyer would have contradicted other evidence given with respect to the statements that Mr. Bennett gave in those interviews. We therefore reject Mr. Bennett's contentions that the delay in filing charges against him was so prejudicial as to amount to a violation of his due process rights.

## II.

■ Under Arkansas law, any registered voter who is a "resident ... of the county in which he or she [is] summoned for jury service is legally qualified" to be a juror in a state court trial. *See* Ark.Code Ann. § 16–31–101; *see also* Ark.Code Ann. § 16–31–102(a)(1). Mr. Bennett's third state court jury included a woman who was a registered voter in the county where the trial was held but was not a resident of that county. Mr. Bennett contends that because that juror did not meet the statutory requirements for jury

service in his case, he was denied his right to an "impartial jury," *see* U.S. Const. amend. VI; *see also* U.S. Const. amend. XIV, § 1.

In *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984), the Supreme Court remarked that only those circumstances "that affect a juror's impartiality can truly be said to affect the fairness of a trial" and therefore to justify invalidating a jury verdict. In this circuit, in *United States v. Humphreys,* 982 F.2d 254, 261 (8th Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 61, 126 L.Ed.2d 31 (1993), the court remarked that "[f]ailure to have one of the [statutory] juror qualifications ... should not *necessarily* render an individual fundamentally unfit to serve" (emphasis supplied). In order to obtain a new trial in this circuit based on the service of a juror statutorily ineligible to serve, "it is incumbent upon the [aggrieved person] to clearly demonstrate that the juror's lack of qualifications presented actual bias or prejudice, affecting the juror's impartiality and [affecting] the fairness of the trial. A challenge after the verdict without such a showing comes too late." *Id.*

The state trial court in Mr. Bennett's case held a hearing on Mr. Bennett's motion for a new trial on account of the statutorily unqualified juror. At that hearing, the juror conceded that although she used to live in the county where the trial was held, she had moved into an adjacent county at least a year before the trial. When asked if she remembered the state trial court asking if all of the venirepersons were "qualified electors" in the county where the trial was held, she responded, "I thought he meant was I eligible, you know, to vote in this county." Since she was still a registered voter in the county where the trial was held, she said, she answered affirmatively.

The Supreme Court has noted that "jurors are not necessarily experts in English usage. Called from all walks of life, many may be uncertain as to the meaning of terms which are relatively easily understood by lawyers and judges." *McDonough Power Equipment, Inc.,* 464 U.S. at 555, 104 S.Ct. at 849. "To invalidate the result of a ... trial because of a juror's mistaken, though honest, response to a question, is to insist on something closer to perfection than our judicial system can be expected to give." *Id.*

Because the juror acknowledged in addition, however, that she recalled another venireperson who had moved outside the county where the trial was held "[getting] up and [telling] the Judge that she had moved and [then being] excused," Mr. Bennett argues that the juror intentionally withheld information that she knew would disqualify her from jury service in his case (Mr. Bennett offers no motive for such an action on the juror's part). When asked during the state trial court hearing if she "wonder[ed] whether or not [she] should have told [the judge] that [she] had moved ... at that time," the juror responded, "Well I did but I didn't know what to do since I was already picked, so I just sat there and kept my mouth shut.... I didn't know that it mattered." With reference to the other venireperson who was excused, the juror stated that she "just thought [that the other venireperson] was moving or something ... [and] just didn't want to be on the jury." The juror denied that she "knowingly [gave] any kind of false answer ... as to [her] residence." On questioning from the state trial court, the juror stated that she considered the county where the trial was held to be "[her] home," that she lived there "for almost 30 years," and that she left school in the ninth grade when she got married.

Taking all of the juror's testimony into account, the state trial court held that the juror "did not knowingly answer falsely any questions, that she was an unbiased juror and that [Mr. Bennett] was not prejudiced" by her service as a juror in his case. We give those findings "a presumption of correctness," "in the absence of a more definitive problem in the record." *Cannon v. Lockhart,* 850 F.2d 437, 440 (8th Cir.1988); *see also* 28 U.S.C. § 2254(d). Mr. Bennett has offered no additional facts to contradict the record. Because the state trial court's findings are amply supported by the record, we reject Mr. Bennett's contention that he was denied an impartial jury.

### III.

During his state court trial, Mr. Bennett acted as co-counsel with his lawyer. On the

first day of trial, while Mr. Bennett was cross-examining the emergency medical technician who responded to the report of Mrs. Bennett's drowning, the lawyer moved to admit an exhibit. The state objected to both the lawyer and Mr. Bennett speaking for the defense during the cross-examination of the witness. In response, the state trial court declared, "Only one of you at a time can handle this part of the trial. In other words, you can't double team [the lawyer for the state]." When Mr. Bennett's lawyer replied, "[A]ll I've done is move to introduce [the exhibit] at the proper time," the state trial court answered, "One of you should do it. Not both." At that point, Mr. Bennett's lawyer said, "All right. I apologize to the Court. It wasn't intentional, we'll do it that way from now on." Mr. Bennett then resumed cross-examining the emergency medical technician.

Later in that cross-examination, the state made a hearsay objection to certain testimony. Mr. Bennett's lawyer interposed, "It's not offered, Your Honor—" but was interrupted by the state trial court, "I believe Mr. Bennett is conducting the inquiry." Mr. Bennett's lawyer responded, "All right." Mr. Bennett then again resumed cross-examining the emergency medical technician.

Mr. Bennett subsequently moved for the admission of several items of physical evidence (the alleged contents of his wallet on the night of his wife's death). The state objected, citing lack of foundation and failure to establish a chain of custody. Mr. Bennett's lawyer attempted to offer argument on the legal questions at issue but was rebuffed by the state trial court, which said, "Only one of you can speak. You can confer." After Mr. Bennett and his lawyer conferred, Mr. Bennett offered argument on both the question of foundation and that of chain of custody. The state trial court sustained the objection.

At the end of the cross-examination of the emergency medical technician, Mr. Bennett's lawyer stated that he wanted to recall the witness on the next day "for the purpose of introducing these documents." The state trial court granted permission. At the beginning of the following day, however, after

inquiry by the state trial court, Mr. Bennett's lawyer declined the opportunity to recall the witness. In closing argument, which took place on the third day of trial, Mr. Bennett's lawyer referred to the testimony of the emergency medical technician, stating, "We figured ... why should I call [the emergency medical technician] back and subject the jury to the same type of inconsistencies between written and spoken word that we heard the first day. We've heard him. Why should I call him back. I checked his testimony, we don't want to put him back on the stand. He's already had his say and we think it's just as much for us as it was for the state."

Mr. Bennett now argues that he was deprived of the effective assistance of counsel by virtue of the state trial court's restriction of his lawyer's attempt to argue the legal questions related to the introduction of the alleged contents of his wallet on the night in question. We see no constitutionally significant ineffective assistance of counsel occasioned by the actions of the state trial court.

■ In the first place, we do not believe that the state trial court's actions deprived Mr. Bennett of "reasonably effective" representation, *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Mr. Bennett's arguments on the legal questions of foundation and chain of custody were made only after he was allowed to confer with his lawyer. Those arguments, moreover, were perfectly coherent and appropriately germane to the objections raised. We see no realistic likelihood that the state trial court's ruling, which was correct, in our view, would have been any different if Mr. Bennett's lawyer, rather than Mr. Bennett himself, had argued the legal questions.

Secondly, we fail to see that the state trial court's actions were in any way "prejudicial to the defense," *id.* at 692, 104 S.Ct. at 2067. Indeed, Mr. Bennett's lawyer explicitly declined the opportunity to recall the emergency medical technician, and Mr. Bennett said nothing. He makes no declaration now that he was somehow prevented from objecting to that decision by his lawyer. Given those circumstances, we reject Mr. Bennett's argument that the state trial court's restrictions

on him and his lawyer deprived him of effective assistance of counsel.

## IV.

Mr. Bennett contends that the state trial court improperly admitted a statement that he made to the deputy sheriff and a state police investigator two days after Mrs. Bennett's death. Specifically, Mr. Bennett asserts that that statement was given in the absence of the warnings mandated under *Miranda v. Arizona,* 384 U.S. 436, 444, 467–68, 86 S.Ct. 1602, 1612, 1624–25, 16 L.Ed.2d 694 (1966), for persons in custody. The magistrate judge found that Mr. Bennett was not in custody at the time the statement was made and therefore that *Miranda* was inapplicable.

The state trial court for Mr. Bennett's second trial held a hearing on Mr. Bennett's motion to suppress that statement. At that hearing, the deputy sheriff testified that he and a state police investigator "set up an appointment with [Mr. Bennett] to meet with him at the [motel] where he was staying.... At that time his lawyer was [the lawyer who had assisted Mr. Bennett in local land transactions] ... and Mr. Bennett stated that he wanted his lawyer present when he talked [to] us." The deputy sheriff further testified that Mr. Bennett arranged for the local lawyer to be present for the interview, that Mr. Bennett and the lawyer "told us ... what time to come," that Mr. Bennett and the lawyer were "waiting for us when we arrived at the motel," that the lawyer "stayed with him throughout the entire time," and that "when we left the two was left together." The deputy sheriff stated that "the only questions, if I can recall correctly, was just to ask—I think [the state police investigator] had asked Mr. Bennett to tell us what happened, and that was it.... I don't believe ... I asked him any questions at all at that time." Mr. Bennett was not arrested after the interview.

On cross-examination, the deputy sheriff acknowledged that he was probably in uniform, wearing a badge, and carrying a gun at the time of the interview. He also conceded that he was "very suspicious of the drowning from the very beginning" and that Mr. Bennett "would have been" the only suspect of either homicide or insurance fraud. He denied, however, that he in fact considered Mr. Bennett a suspect at the time, saying, "We were trying to ... find out his version of what happened."

The state police investigator also testified at the hearing. He said that he "identified himself as being [a state police] investigator ... and I ... asked [Mr. Bennett] to explain to me what had happened, the circumstances surrounding his wife's death. And he went into detail with me about it ... and ... I took some very general notes at that point, and two days later dictated the interview." The state police investigator denied that he made "any threatening or coercive statements to Mr. Bennett to get him to give ... this statement" and further asserted that "[a]t that point [Mr. Bennett] was not perceived by me as being a suspect of any crime."

On cross-examination, the state police investigator conceded that "from what [the deputy sheriff] related ... Mr. Bennett was certainly a suspect in [the deputy sheriff's] mind" and that the incident "was treated as a criminal investigation." He also stated that although the local lawyer was present at the interview, "I didn't perceive him to be the attorney representing Mr. Bennett as a suspect."

Mr. Bennett himself also testified at the hearing. He stated that he "did not ask [the local lawyer] to come," that the lawyer "arrived at the same time the detectives did, or before," and that "I didn't even know they were coming." Mr. Bennett further testified that both the deputy sheriff and the state police investigator stood between him and the door during the interview. After the hearing, the state trial court held that Mr. Bennett was "not in custody at the time. His freedom was not restrained." The state trial court then denied Mr. Bennett's motion to suppress the statement.

"*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)

(*per curiam*). In determining whether Mr. Bennett was in custody when he gave his statement to the deputy sheriff and the state police investigator, "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on [his] freedom of movement' of the degree associated with a formal arrest," *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (*per curiam*), quoting *Oregon v. Mathiason,* 429 U.S. at 495, 97 S.Ct. at 713–14.

The most relevant considerations in this determination are whether Mr. Bennett was told at the time that his cooperation was optional, that he was free to leave or to ask the police officers to do so, or that he was not under arrest; whether he had "unrestrained freedom of movement" during the interview; whether he "voluntarily acquiesced to official requests to respond to questions"; whether the police officers used "strong arm tactics or deceptive stratagems"; whether the atmosphere during the interview was "police dominated"; and whether he was arrested after the interview. *United States v. Griffin,* 922 F.2d 1343, 1349 (8th Cir.1990). "It is not necessary to a finding of custody that all of the foregoing indicia be presented by the factual circumstances of a case, ... and a particularly strong showing with respect to one factor may compensate for a deficiency with respect to other factors." *Id.*

We see no reason to question the magistrate judge's conclusion that Mr. Bennett was not in custody when he gave the challenged statement. We do not know whether the police officers told Mr. Bennett that his cooperation was optional or that he was free to leave, but there was credible testimony that Mr. Bennett himself arranged the interview on request and that he was accompanied during the entire interview by a friend, the local lawyer. There is no evidence of "strong arm tactics or deceptive stratagems," *id.,* nor was Mr. Bennett arrested after the interview. Although the deputy sheriff most likely considered Mr. Bennett a suspect of either homicide or insurance fraud, the deputy sheriff never voiced those suspicions. His views at that time, therefore, are irrelevant. *See, e.g., Stansbury v. California,* —— U.S. ——, ——, 114 S.Ct. 1526, 1529–30, 128

L.Ed.2d 293 (1994); *see also Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151–52, 82 L.Ed.2d 317 (1984). Mr. Bennett testified that the police officers stood between him and the door, but he never stated that he felt "physical or psychological restraint," *United States v. Griffin,* 922 F.2d at 1347, because of that fact. Indeed, he did not even remember whether either police officer was in uniform. Given "the entire circumstances" of this case, *id.,* we reject Mr. Bennett's arguments with respect to the challenged statement.

### V.

Mr. Bennett next contends that three particular evidentiary rulings of the state trial court were so prejudicial to him as to amount to a violation of his due process rights. *See, e.g., Manning–El v. Wyrick,* 738 F.2d 321, 322 (8th Cir.1984) (*per curiam*), cert. denied, 469 U.S. 919, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984). In order to prevail in this circuit on such a claim, the aggrieved person "must prove that the asserted error was so conspicuously prejudicial or of such magnitude that it fatally infected the trial and deprived him of fundamental fairness.... In making this determination, we must review the totality of the facts in the case and analyze the fairness of the particular trial under consideration." *Id.* at 323.

■ Mr. Bennett first challenges the state trial court's ruling that the deputy sheriff could testify as an expert with respect to the likely result if a person jumped from a bridge 25 feet high into water five feet deep (as Mr. Bennett alleged that he did in an attempt to save his wife). On direct examination by the state, the deputy sheriff testified that he had 21 years of experience in the Marines, that he had "been through escape and evasion school ... [and] abandon ship drills," and that he had jumped from a tower 40 feet tall into approximately 20 feet of water. When the state asked the deputy sheriff for his conclusion about "[w]hat would happen" if a person of Mr. Bennett's size (approximately six feet tall) jumped from a bridge 25 feet high into water five feet deep, the defense objected that the deputy sheriff was not an expert in such matters. The

state trial court overruled the objection. The deputy sheriff then testified to his conclusion that under the circumstances specified, "You have nothing but pure weight falling. You have nothing there to break it.... you'll hit that bottom, your knees will come up and without any question, it would probably break your legs." The deputy sheriff further testified that if a person in those circumstances were wearing glasses (as Mr. Bennett alleged that he was at the time), "it would have jarred him to such a point the glasses would have had to come off" if they were not "tied on" (Mr. Bennett alleged that his glasses got muddy but stayed on).

Mr. Bennett also asserts that the state trial court improperly restricted the defense cross-examination of the deputy sheriff. On cross-examination, Mr. Bennett (who was acting as co-counsel at that time) requestioned the deputy sheriff on his conclusions about a jump from a height of 25 feet into water five feet deep, then asked, "Then would you please tell me how an Olympic diver can come off of a 32 foot board, feet first, and never hit the bottom at nine and a half feet? They do it in all the Olympic college meets." At that point, the state objected to "this testimony by the defendant." The state trial court sustained the objection. In response to a subsequent question, the deputy sheriff remarked, "There's a lot of difference ... between diving and jumping." Mr. Bennett then said, "I know, I spent two times in the Navy." The deputy sheriff went on, "You said Olympic divers. I've never seen an Olympic diver jump off a—" but was interrupted by Mr. Bennett, who asked, "32 feet?" The deputy sheriff subsequently said, "Jump or dive, sir?" Mr. Bennett responded, "Dive, with feet—that's okay, we won't go into that," and went on to a different topic.

■ We see no impropriety in the state trial court's ruling that the deputy sheriff could testify about the likely result of a jump from a bridge 25 feet high into five feet of water, given the deputy sheriff's statements about his experience with jumps into water. Nor do we see any violation of due process in the state trial court's refusal to allow Mr. Bennett's own testimony about Olympic divers during his cross-examination of the deputy sheriff, especially in view of the fact that Mr. Bennett himself later acknowledged that there was "a lot of difference" between jumping and diving and, in fact, dropped the topic altogether shortly afterward, without any prompting from the state trial court. We see neither error by the state trial court nor prejudice from the challenged actions "of such magnitude that it fatally infected the trial and deprived [Mr. Bennett] of fundamental fairness," *Manning–El,* 738 F.2d at 323.

■ Finally, Mr. Bennett challenges the state trial court's ruling that Mrs. Bennett's daughter (from Mrs. Bennett's first marriage) could testify about various alleged "bad acts" of Mr. Bennett subsequent to his wife's death. Those acts were ordering that her body be cremated; selling all of the "household goods and furniture and things like that" at an auction (which Mrs. Bennett's three children picketed); becoming "cold and scary," which prompted the children to move to their maternal grandmother's house after three weeks of living solely with Mr. Bennett; and billing the children's grandmother for a proportional share of the children's social security money (received because their father, Mrs. Bennett's first husband, died while the children were minors) to reimburse Mr. Bennett for the three weeks that the children stayed with him.

Mr. Bennett himself cross-examined Mrs. Bennett's daughter. As far as we can tell from the transcript of the state court trial, that cross-examination was at least as long as, and probably slightly longer than, the direct examination. In that cross-examination, which was essentially unrestricted by the state trial court, Mr. Bennett suggested that the auction had been ordered by the probate court, that he had "told [the children's] grandmother that [they] could pick up anything," that Mrs. Bennett was "in real bad financial condition" when she met him, that her daughter "resented" the marriage and "rebel[led] a good bit over it," and that her daughter "left because [he] asked [her] to do part of the work."

Given the facts that Mr. Bennett's suggestions (interposed in the form of questions) were made without objection from the state

and that Mr. Bennett's cross-examination of Mrs. Bennett's daughter was quite thorough, we do not believe that the challenged testimony "fatally infected the trial and deprived [Mr. Bennett] of fundamental fairness," *Manning–El,* 738 F.2d at 323. We therefore reject his arguments with respect to that testimony.

## VI.

Finally, Mr. Bennett argues that the evidence is constitutionally insufficient to sustain his conviction and that he is actually innocent. He offers no further evidence of his alleged actual innocence, however, so we decline to consider that claim.

"[T]he critical inquiry on review of the sufficiency of the evidence ... must be ... to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.... [T]he relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *see also id.* at 324, 326, 99 S.Ct. at 2791–92, 2792–93. We have read the entire transcript of Mr. Bennett's state court trial. In our view, a rational trier of fact, evaluating the evidence presented "in the light most favorable to the prosecution," *id.* at 319, 99 S.Ct. at 2789, could conclude beyond a reasonable doubt that Mr. Bennett murdered his wife. We therefore reject his arguments with respect to the sufficiency of the evidence.

## VII.

For the reasons stated, we affirm the judgment of the district court denying Mr. Bennett's petition for habeas relief.