IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

—————————

No. 93-7719

—————————

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

A. GUY CROUCH, III and
MICHAEL J. FRYE,

Defendants-Appellees.

—————————

Appeal from the United States District Court for the
Southern District of Texas

May 30, 1996

—————————

Before POLITZ, Chief Judge, KING, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART, PARKER and DENNIS, Circuit Judges.

GARWOOD, Circuit Judge:

In this prosecution for alleged savings and loan offenses, the district court, prior to trial, dismissed the indictment against Guy Crouch III (Crouch) and Michael Frye (Frye) for pre-indictment delay, notwithstanding that the statute of limitations had not run. *United States v. Crouch*, 835 F.Supp. 938 (S.D. Tex. 1993). The government appeals.

The district court, following a hearing before a magistrate judge, concluded that the delay was sufficiently extensive "to

constitute substantial presumptive prejudice" and was also shown to "have resulted in some actual prejudice." *Id*. at 943. Characterizing the government's reasons for the delay as essentially "insufficient personnel available to investigate or properly prepare," the district court concluded that such reasons were "at best, entitled to only slight weight in the balance of due process considerations" and did not outweigh the "prejudice, actual and presumptive." *Id*. at 946. Although opining that the delay "certainly smacks of negligence," the court determined that "the record, in its present form, will not justify a finding of bad faith, but because of [discovery and evidentiary] limitations imposed by . . . the Magistrate Judge, it cannot be ruled out." *Id*. at 943 & n.6.

A divided panel of this Court affirmed the dismissal of the indictment. *United States v. Crouch*, 51 F.3d 480 (5th Cir. 1995). The panel majority recognized that for pre-indictment delay "the triggering prejudice must be actual, not presumptive," but concluded that the district court's finding of actual prejudice was adequately supported. *Id*. at 484-485. Relying on *United States v. Townley*, 665 F.2d 579 (5th Cir.), *cert. denied*, 102 S.Ct. 2305 (1982), the panel majority further held that no showing of prosecutorial bad faith was required, and that instead the reasons for the delay would be balanced against the extent of the prejudice. *Crouch* at 483. The panel majority held that the government's reasons—"essentially, lack of manpower and the low priority which this investigation was assigned"—were "insufficient

2

to outweigh the actual prejudice to Crouch and Frye." *Id*. at 485. It concluded that "requiring Crouch and Frye to stand trial now would be fundamentally unfair and violative of due process." *Id*. We granted the government's suggestion for rehearing en banc.

We now reverse the district court's order dismissing the indictment. We hold that where the indictment is not barred by the statute of limitations, dismissal for pre-indictment delay requires an appropriate showing not only of prejudice but also that the prosecution purposely delayed the indictment to gain tactical advantage or for other bad faith purpose. We further hold that the present record does not support a finding of the requisite actual, substantial prejudice—as opposed to potential prejudice—to justify dismissal prior to trial. "Events of the trial may demonstrate actual prejudice, but at the present time appellees' due process claims are speculative and premature." *United States v. Marion*, 92 S.Ct. 455, 466 (1971).

### BACKGROUND

Offenses Charged

The instant indictment was returned November 12, 1992. It contains 19 counts. Crouch is named a defendant in all counts, and Frye is named a defendant in counts 1, 2, 8, 13, and 18. The only other defendant charged in the indictment—Kerry Shawell, charged in counts 1, 2, 9, 14, and 19—had pleaded guilty, and agreed to cooperate with the government, before the hearing on the motions of Crouch and Frye to dismiss for preindictment delay. The indictment concerns seven loans, all of which closed June 28, 1985, made by

3

Delta Savings Association (Delta), a federally-insured savings and loan association located in Alvin, Texas. Crouch was the Chairman of the Board of Delta, and a member of its loan committee, from approximately January 1985 until resigning in September 1986. He was also Delta's attorney, and was half owner, with his father, of the title company at which the loans in question, and apparently many other Delta loans, closed. The seven loans included: two (for $915,000 and $1,439,000) to Robert Ferguson, a real estate broker and investor, and his company, Ferguson C&D, Inc., to buy from Bankers Savings and Loan Association (Bankers), a federally-insured savings and loan association located in Galveston, Texas, certain real estate on which Bankers had foreclosed (known as real estate owned, or REO); three loans (for $505,780, $825,300, and $1,200,000) to Mark Connally (Connally), two of which were for the purchase from Ferguson of the REO Ferguson had purchased from Bankers and one of which was an operating capital loan; one $3,950,000 loan to Frye, a real estate investor and developer, and his company, J.M.G. Financial Corporation (J.M.G.), to buy from Delta a Delta REO tract; and one $1,250,000 loan to Shawell and his company, Kerry Shawell Interests, Inc., to buy from Delta another Delta REO tract. The indictment charges false entries, 18 U.S.C. § 1006; false statements, 18 U.S.C. § 1014; misapplication of funds, 18 U.S.C. § 657; bank fraud, 18 U.S.C. § 1344; and conspiracy under 18 U.S.C. § 371 to commit those offenses.

The conspiracy and the bank fraud (executing and attempting to execute "a scheme and artifice to defraud Delta") were charged in

4

counts one and two, respectively, and allegedly lasted from "about December, 1984 and continuing through on or about August 1985." The remaining counts are substantive counts, and are alleged to have been committed "on or about June 28, 1985" in counts 3 through 14, and "between June 1985 and August 1985" in counts 15 through 19. Counts 3 through 7 charge Crouch alone with section 657 misapplication of Delta funds as to, respectively, the two loans to Ferguson and the three loans to Connally. Count 8 charges Crouch, aided by Frye, with section 657 misapplication as to the Frye loan; and count 9 charges Crouch, aided by Shawell, with section 657 misapplication as to the Shawell loan. Counts 10, 11, and 12 charge Crouch alone with section 1006 false entries as to, respectively, each of the three loans to Connally. Count 13 charges Crouch, aided by Frye, with section 1006 false entry as to the Frye loan; and count 14 charges Crouch, aided by Shawell, with false entry as to the Shawell loan. Counts 15, 16, and 17 charge Crouch alone with section 1014 false statements as to, respectively, each of the three Connally loan applications. Count 18 charges Crouch and Frye with section 1014 false statements as to the Frye loan; and count 19 charges Crouch and Shawell with section 1014 false statements as to the Shawell loan.

While certain aspects of the government's theory of the case are not entirely clear, it is evident that the loans to Connally, Frye, and Shawell are all alleged to be nominee loans, with Frye and Shawell being nominees for Ferguson, and Connally also, at least to some extent, being a nominee for Ferguson. It may further

5

be the government's theory that Connally was also to some extent a nominee for the partnership of Ben Barnes and John Connally. The nominee status was in each instance allegedly at least in part for the purpose of avoiding loans to one borrower limitations, particularly as to Ferguson. The section 1006 false entry and section 1014 false statement counts are predicated on falsely identifying the particular nominee borrower (Connally, Frye, and Shawell) as being the true borrower.

Count one, the conspiracy count, appears to essentially allege the counts 3 through 19 substantive offenses as objects of the conspiracy. It alleges that Crouch, Frye, and Shawell conspired with each other and "with other individuals, both known and unknown." In response to a motion for bill of particulars, the government identified Carl Gerjes—who was president of Delta until he was discharged sometime during May or June 1985—and Ferguson as "[t]he unindicted co-conspirators." The government also stated that "arguably" the term "may also cover" Barnes and Mark Connally.[1] The conspiracy count also refers to activities in furtherance of the conspiracy by "Delta insiders," and the response to the bill of particulars states that "Delta insiders" refers to Gerjes, Cholakian, a Delta officer who succeeded Gerjes as president in May or June 1985, and Erskin, another Delta officer. The government's general theory of the case is set forth in its response below to Frye's motion to dismiss for failure to charge an

_____

[1]The same grand jury, consistent with the government's recommendation, had declined to indict Barnes and Mark Connally.

6

offense, as follows:

> "1.   Between December, 1984 and June 28, 1985, defendant Crouch, Robert B. Ferguson and others devised a scheme to rid Delta's records of various tracts of real estate acquired by the thrift through foreclosure.  Part of the scheme required that Ferguson provide persons willing to pretend to be bona fide buyers of the property and to sign loan contracts purporting to evidence their purchase of the Delta real estate.
> 2.   In furtherance of this plan, Ferguson caused defendants Frye and Shawell to prepare loan applications, personal financial statements, board of directors' minutes, corporate resolutions and other documents portraying the defendants as intended purchasers of Delta real estate located near Houston, Texas.  Additionally, the sham buyers signed Delta loan contracts purporting to finance the purchases in their name.  It was the understanding of all parties that the named buyers were mere nominee borrowers on behalf of Ferguson.  All parties to the scheme were aware that the use of nominee borrowers was necessary in order to avoid loan to one borrower limitations.
> 3.   In furtherance of the scheme, defendant Frye submitted to Delta the documents described above and signed as borrower on the loan supporting the transaction.  The wording of the documents was such that they represented to persons unfamiliar with the scheme defendant Frye's intent to buy the real estate and to be held personally liable on the real estate loan for the purchase.  The documents omitted any declaration that the loan was a nominee loan intended to benefit Ferguson, defendant Crouch and others.
> 4.   Defendant Frye participated in this scheme because he anticipated preferential treatment by Delta in future transactions.  Additionally, defendant Frye believed that Ferguson was acquiring Bankers Savings and Loan Association of Galveston and that he -- Frye -- would receive preferential treatment there, as well."

At the July 1993 hearing before the magistrate judge, the

government further explained its theory as follows:

> ". . . as this deal was done, only Mr. Crouch was aware of everyone's identity and involvement.  Mr. Ferguson was purchasing a savings and loan in Galveston.  He was attempting to swap REO properties from Banker's to Delta.  Delta had some REO properties it needed to get rid of and they were going to swap or sell their properties to Banker's through the person of Robert Ferguson.

7

Sir, Mr. Ferguson knows that properties were to be swapped. He did not know who was purchasing the properties until just before the closing. He didn't know that Ben Barnes and Mark Connally would be brought in. We have evidence that he did not know that Mark Connally was to be substituted in as a nominee until literally at the closing.

There is no evidence to suggest that Ben Barnes or Mark Connally ever heard the names Kerry Shawell or Michael Frye. They only knew that there were loans that they were involved in and certain circumstances.

All of these loans took place on the same day. All of them were either closed at Defendant Crouch's office in Alvin; or with regards to Mr. Frye and Shawell, Robert Ferguson actually took those documents to those individuals and had them sign everything and had it notarized."

At this hearing, the government also essentially admitted it had no *direct* evidence of Frye's knowledge or involvement other than in respect to counts 8, 13, and 18, each relating to the $3,950,000 loan to him. To show Frye knew he was a nominee borrower, the government stated it would rely on expected testimony of Ferguson, Gerjes "and others, Mr. Shawell," admissions Frye made in July 1986 to Federal Home Loan Bank Board (FHLB) examiner Mims, and 1986 "letters of Mr. Frye and his attorney" to Delta stating that he "purchased the property as an accommodation to Mr. Crouch and Mr. Ferguson."

Another aspect of the government's theory of the case is reflected by Gerjes' testimony on cross-examination by the government at the hearing before the magistrate judge.[2] Gerjes stated that in his capacity as Delta's president he had negotiated and dealt with Barnes and Mark Connally in regard to the charged

_____

[2]Gerjes was called as a witness by Frye at the hearing.

8

Mark Connally loans as part of an effort to rid Delta of REO. He did not recall in this regard "any one person directing me" or "anyone saying, you definitely do this or you definitely do that," or "that anyone specifically assigned me" that responsibility. Typically, he would "report back to a loan committee meeting and tell them of my findings" and "about what" he was "negotiating with Barnes/Connally." Crouch was on the loan committee. Gerjes also testified that he was not at the June 28, 1985, loan closings because Crouch had fired him as Delta's president about a month earlier, although he remained "technically on the rolls of Delta for some time after that."

In its response to the motion for bill of particulars, the government described "Defendant Crouch's obtained benefit" from the various charged offenses as follows:

> "His law firm earned legal fees. His title company earned title related fees. He earned fees and bonuses related to his board of directors position. His actions kept the federal regulators from immediately taking over the institution which would have caused any stock owned by Crouch and his family to be worthless."

The record suggests that Crouch personally owned about 5% of Delta's stock. His father, who was not on the board at any time during or after 1985, owned about 34% of the stock, and another some 34% was owned by board member Gubert, who preceded Crouch as chairman.

Investigation

Delta was apparently placed under state supervision and control in May 1986, as reflected in a report of examination prepared by FHLB examiner Mims, a copy of which is attached as an

9

exhibit to Crouch's motion to dismiss for pre-indictment delay.[3] Delta was apparently completely taken over by the authorities in September 1986. The report attached to Crouch's motion concerns many aspects of Delta's operations and financial condition, and includes specific questioning of certain loans, including the seven loans at issue here, as well as, among others, certain unrelated loans to one Carl Vaughan. The report concludes, among other things, that "[a]ll aspects of the JMG and Shawell transactions indicate that JMG and Shawell were acting as nominees for Ferguson C&D, Inc.," that there were "willful violations of the loans-to-one-borrower limitation" with respect to Ferguson, among others, that review of title company and Delta records pertaining to the seven loans reflect "an apparent attempt by the association and borrowers to misrepresent material facts," that "certain aspects of the transaction appear to fall within the purview of Title 18, United States Code Section 1001," and that "[t]he examiner concludes that the Loan Committee was aware of the material violations of the loans-to-one-borrower limitations." This report likewise reflects the following statements by then Delta president Cholakian:

> "In response to the loan underwriting deficiencies uncovered during the examination, President Terry Cholakian stated that former Managing Officer Carl Gerjes and former Senior Vice President of Real Estate Lending W.A. Erskine had little regard for loan underwriting regulations. According to Ms. Cholakian, Messrs. Gerjes and Erskine were primarily concerned with closing loans

---

[3]Although this document states that it is a report of "Examination As Of March 10, 1986," it refers to events occurring well after March 1986.

10

now and worrying about regulations later.

. . . President Cholakian remarked that prior to July 1985, loans were closed outside of the Loan Committee. Messrs. Gerjes and Erskine agreed to loan commitments first and then presented the details to the full committee, at which point all committee members were expected to sign.

Loan Committee procedures have changed since July 1985. According to Ms. Cholakian, all loans are now approved during committee meetings, and underwriting guidelines and procedures have been established.

. . . .

President Cholakian provided the following statement with regard to the transactions involved with the aforementioned two escrow closings [Frye and Shawell]:

'*In addressing the situation on the Ferguson direct loans and nominee loans, I have informed you and your staff that neither I, nor any other member of current management, has all of the facts surrounding this arrangement. This was put together by the former president, Carl Gerjes, and I have not been able to find any written documentation or clarification of the transaction. I have also not been able to find any written agreements that outline the transaction and expected actions of the parties.*

'*It has become clear to us, here now, that JMG and Shawell are nominees for Ferguson. We had to deduce that from the subsequent actions and responses of JMG and Shawell on requests for financial statements and interest payments. . . .*'"

In August 1986, the FHLB examiner sent "criminal referrals" to the FBI and the United States Attorney with respect to Delta concerning at least these seven loans and the Carl Vaughan transactions, and at least the former implicated Crouch and Frye, among others, though Crouch's name was not among the target names listed on the cover sheet (whether Frye's was is not stated). FBI special agent Kettler, in charge of the Delta investigation during most of the time thereafter, testified that such a referral was

"generally a summary of an event or a transaction that the examiner feels that needs to be looked into as far as possible criminal involvement or needs some work for a criminal investigation." Kettler testified he worked on the matter off and on since then, but not on a concentrated basis until 1991. In April 1987 Kettler received another FHLB criminal referral in reference to "bonuses"—apparently some form of kickbacks—paid Gerjes (and also involving Cholakian) in 1983 and 1984. He focused on this because of the five-year statute of limitations.[4] Gerjes was indicted for these "bonus" offenses in the summer of 1989, and was tried and convicted of them later that year. Crouch's father testified against Gerjes at this trial, and though Crouch did not testify, he apparently had been subpoenaed by the government and was ready to testify to identify records. In July 1987, Kettler received still another FHLB criminal referral concerning Delta, this time also in relation to certain other matters not involved in this case. In August 1986 in the Galveston area of the Southern District of Texas—the locus of the offenses at issue—there were only three FBI agents, and there was no financial analyst or similarly skilled person. Of the three agents, one worked exclusively on drug cases. Kettler and the other agent were responsible for all other federal offenses. A fourth agent was added in late 1987, but she was soon reassigned to Houston and did not return until the summer of 1988. During this time there were seven financial institutions, including

---

[4]The statute of limitations was extended to ten years effective August 1989, except for offenses as to which the statute had run prior to that time. 18 U.S.C. § 3293.

12

Delta, under investigation by these two agents. There were also many other cases, including the "McConnell case," which came into Kettler's office about three months after the first Delta referral and which he described as "about the largest white collar fraud that we had in the Houston division." Kettler worked "exclusively" on that case for "six months or so." The disappearance of a young girl and a case of ongoing industrial espionage at Dow Chemical also each involved significant amounts of time. Priority was assigned to cases involving danger to human life, ongoing offenses, and cases in which limitations were close to running. A fifth agent was added in 1990, and a sixth and seventh and a financial analyst were added in 1991.

In 1990, after Gerjes' conviction and sentencing in the bonus case, Kettler began focusing more on Delta, gathering and examining documents. There were forty boxes of records. Kettler interviewed employees at Delta (some before Delta closed), and he interviewed Mims (with whom he had previously talked on the telephone) in 1991 and Frye some time in 1990 (after September of that year) or possibly 1991. In January 1992, Ferguson pleaded guilty to charges in connection with the instant transactions pursuant to a deal, and, according to the government's response to Crouch's motion to dismiss, Ferguson "gave information which focused the government's investigation squarely on defendants Crouch, Frye and Shawell." In March 1992 Gerjes pleaded guilty to charges in connection with the instant transactions and likewise agreed to cooperate with the government. Gerjes' sentencing on this conviction has apparently

been postponed, as has Ferguson's sentencing, pending their testimony in Crouch and Frye's anticipated trial.

Frye testified before the grand jury in November 1992. Crouch never testified before the grand jury.

Crouch testified at the hearing before the magistrate judge on the motion to dismiss. He related that in the spring of 1986, when Mims examined Delta, Mims requested, and received from Crouch, the Delta records concerning the transactions in question and said "no, we do not" when Crouch asked "if he had any problems with me in connection with those transactions." Crouch also stated that he and his father were visited in 1989 by an Assistant United States Attorney in connection with the Gerjes bonus prosecution and was told that he, Crouch, "was not the subject of an investigation." In September or October 1990, Kettler came to Crouch's title company to get documents consisting of or including those concerning these loans, and was furnished copies. Kettler, in response to Crouch's inquiry, said Crouch was not a subject of the investigation. Kettler returned in June or September 1991 with a subpoena and procured the original records.[5] Again on this occasion, Kettler responded "no" to Crouch's inquiry whether he was a subject of the investigation. In March 1992, Crouch was told he was a subject of the grand jury investigation and might be indicted (Frye was also so notified at that time). Other aspects of

---

[5] Other evidence presented by Crouch indicated the records then procured may have consisted of or included documents related to other loans, and did not include those relating to Mark Connally.

14

Crouch's testimony and other evidence at the hearing before the magistrate judge are related below in connection with our consideration of the showing of prejudice. Frye did not testify before the magistrate judge.

Rulings Below

The magistrate judge recommended granting the motion to dismiss. He concluded that the delay in indictment was presumptively prejudicial, relying on *Doggett v. United States*, 112 S.Ct. 2686 (1992), although recognizing *Doggett* was a Sixth Amendment case. He further opined that "[w]hile the Court must confess that Crouch and Frye cannot, for the most part, identify with specificity the actual harm they have suffered as a result of the eight year lapse of time," nevertheless they had "with the added assistance of the presumption attendant to the eight-year delay, proven the existence of substantial prejudice." Relying on *Townley*, the magistrate judge ruled that no showing of bad faith was required, stating "this Court will not, and need not, decide the issue of bad faith." Instead, the magistrate judge balanced the prejudice against the reasons for the delay. It weighed the balance in favor of the defense, noting that "low priority assigned to an investigation, overload of other investigative or prosecutive responsibilities, and insufficient personnel, similar to the reasons offered in the case at bar, are entitled to only slight weight in the balance." However, the magistrate judge did commend the current prosecutor's handling of the case since its assignment to him in May 1991.

15

The district court adopted the magistrate judge's report, except as modified and supplemented in the district court's opinion. *Crouch*, 835 F.Supp. at 938. The district court found that there was presumptive prejudice under *Doggett* and that the defendants had also shown "some actual prejudice to supplement their reliance on the presumption." *Id*. at 943. Relying on *Townley*, the court did not require a finding of bad faith, which it correctly stated the record "will not justify." However, because of the discovery and evidentiary limitations imposed by the magistrate judge, the court stated that it "cannot be ruled out" and "may have to be addressed on another day." *Id*. at 943 & n.6. The court did state that the delay in indictment "certainly smacks of negligence." *Id*. at 943. The court concluded that Crouch was a "target" prior to Ferguson's guilty plea. *Id*. It did not find, however, and nothing in the record tends to show, that the government, whatever it might otherwise have believed or suspected, could have presented a winnable case against Crouch without the testimony of either Ferguson, Gerjes, Shawell, or Frye. The court further held that the reason for the delay advanced by the government, "insufficient personnel available to investigate or properly prepare this case," was "at best, entitled to only slight weight in the balance," and was outweighed by the "prejudice, actual and presumptive," to the defendants, thus requiring dismissal of the indictment. *Id*. at 946.

**DISCUSSION**

16

Bad Faith Requirement

In *United States v. Marion*. 92 S.Ct. 455 (1971), the Supreme Court first addressed pre-indictment delay where limitations had not run. There, the district court had granted, prior to trial, the defendants' motion to dismiss, which asserted that, although the statute of limitations had not expired, the 38-month pre-indictment delay violated their rights to due process and to a speedy trial under the Fifth and Sixth Amendments. *Id*. at 457. The district court concluded that the government had been "aware of the relevant facts" more than two years prior to the indictment. *Id*. at 458. The government appealed directly to the Supreme Court under former 18 U.S.C. § 3731. The Court held that the Sixth Amendment speedy trial clock did not start running until the return of an indictment or other formal charge "or else the actual restraints imposed by arrest and holding to answer a criminal charge." *Id*. at 463. Though conceding that "[p]assage of time, whether before or after arrest, may impair memories, cause evidence to be lost, deprive the defendant of witnesses, and otherwise interfere with his ability to defend himself," the Court also recognized that "[p]ossible prejudice is inherent in any delay, however short; it may also weaken the Government's case." *Id*. at 464 (footnote omitted). *See also id*. at 465 ("Actual prejudice to the defense may result from the shortest and most necessary delay"). Two principal reasons were noted for declining to apply the Sixth Amendment to pre-indictment delay. First, "[a]llowing inquiry into when the police could have arrested or when the

17

prosecutor could have charged would raise difficult problems of proof. As one court said, 'the Court would be engaged in lengthy hearings in every case to determine whether or not the prosecuting authorities had proceeded diligently or otherwise.'" *Id.* at 464 n.13. Second, and more prominently: "'the applicable statute of limitations . . . is the primary guarantee against bringing overly stale criminal charges'" (quoting *United States v. Ewell*, 86 S.Ct. 773, 776 (1966)), and "[s]uch statutes represent legislative assessments of relative interests of the State and the defendant in administering and receiving justice . . . ." *Id.* at 464.

However, *Marion* went on to hold that:

"the statute of limitations does not fully define the appellees' rights with respect to the events occurring prior to indictment. Thus, the Government concedes that the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay *in this case* caused substantial prejudice to appellees' rights to a fair trial *and* that the delay was an intentional device to gain tactical advantage over the accused." *Id*. at 465 (emphasis added).

The Court also noted "we need not, and could not now, determine when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution" and indicated such a determination "will necessarily involve a delicate judgment based on the circumstances of each case." *Id*. at 466. The Court then proceeded to reverse the order of dismissal, holding there was no Sixth Amendment violation and that, as to due process:

"[n]or have appellees adequately demonstrated that the pre-indictment delay by the Government violated the Due Process Clause. No actual prejudice to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some

18

tactical advantage over appellees or to harass them."
*Id.* at 466.

The opinion's final sentence noted that "[e]vents of the trial may demonstrate actual prejudice, but at the present time appellees' due process claims are speculative and premature." *Id.*

The Supreme Court next addressed pre-indictment delay in *United States v. Lovasco*, 97 S.Ct. 2044 (1977), which again involved a dismissal prior to trial. There the district court, following a hearing, dismissed the indictment because of a seventeen-month delay, during the last some six months of which a defense witness died, between the time the government had "all the information relating to the defendant's alleged commission of the offenses" and its presentation to the grand jury. The "Government made no systematic effort in the District Court to explain its long delay" and a divided panel of the Eighth Circuit affirmed (as to all but one count), sustaining "the District Court's finding that the Government's actions were 'unjustified, unnecessary, and unreasonable'" and that the defense had been impaired by the witness's death. *Id.* at 2047. The Supreme Court reversed. It initially reiterated that "statutes of limitations . . . provide '" the primary guarantee, against bringing overly stale criminal charges"'" (quoting *Marion*'s quoting of *Ewell*), and that "the Due Process Clause has a limited role to play in protecting against oppressive delay." *Id.* at 2048. The Court next held that *Marion*'s concluding sentence "establishes only that proof of actual prejudice makes a due process claim concrete and ripe for adjudication, not that it makes the claim automatically valid."

19

*Lovasco* at 2048. "*Marion* makes clear that proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." *Lovasco* at 2048-49. The Court then observed that the due process clause affords protection "only" for violations of "those 'fundamental conceptions of justice which lie at the base of our civil and political institutions'" (quoting *Mooney v. Holohan*, 55 S.Ct. 340, 342 (1935)), and "does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment." *Lovasco* at 2049. Further: "Judges are not free, in defining 'due process,' to impose on law enforcement officials our 'personal and private notions' of fairness and to 'disregard the limits that bind judges in their judicial function.'" *Id.* (quoting *Rochin v. California*, 72 S.Ct. 205, 209 (1952)).

*Lovasco* next rejects the contention that the Constitution requires that charges be filed promptly "once the Government has assembled sufficient evidence to prove guilt beyond a reasonable doubt." *Id.* at 2050. It notes that such a rule "would cause numerous problems in those cases in which a criminal transaction involves more than one person or more than one illegal act," and that "if courts were required to decide in every case when the prosecution should have commenced, it would be necessary for them to trace the day-by-day progress of each investigation," thus burdening both prosecutors and courts. *Id.* & n.14. It concludes

20

in this respect: "We can find no such command in the Due Process Clause of the Fifth Amendment. In our view, investigative delay is fundamentally unlike delay undertaken by the Government solely 'to gain tactical advantage over the accused'. . . ." *Id*. at 2051 (quoting *Marion*, 92 S.Ct. at 465).[6] *Lovasco* goes on to "hold that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been prejudiced by the lapse of time." *Id*. at 2051-52. Thus, the Court holds that the Court of Appeals erred in affirming the dismissal of the indictment. *Id*. at 2052. In what might be described as a postscript, the *Lovasco* Court goes on to observe that "neither this Court nor any lower court has had a sustained opportunity to consider the constitutional significance of various reasons for delay. We therefore leave to the lower courts, in the first instance, the task of applying the settled principle of due process that we have discussed to the particular circumstances of

---

[6]The *Lovasco* Court appended a footnote to this sentence stating:

> "In *Marion* we noted with approval that the Government conceded that a 'tactical' delay would violate the Due Process Clause. The Government renews that concession here, Brief for United States 32, and expands it somewhat by stating: 'A due process violation *might* also be made out upon a showing of prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense.' *id*. at 32-33, n.25. As the Government notes, however, there is no evidence of recklessness here." *Lovasco* at 2051 n.17 (emphasis added).

21

individual cases." *Id*.[7]

Our decisions following *Marion* and before *Lovasco generally* construed *Marion* as stated in *United States v. Butts*, 524 F.2d 975, 977 (5th Cir. 1973), *viz*:

> "In *United States v. Marion*, . . . the Supreme Court held that the applicable statute of limitations being the primary guarantee against bringing overly stale criminal charges, one *must show* (1) that substantial prejudice resulted from the delay in seeking an indictment *and* (2) that the delay was an intentional measure to gain a tactical advantage *before* the indictment *can* be dismissed." (Emphasis added).

Other decisions of ours to the same effect include *United States v. Beckham*, 505 F.2d 1316, 1319 (5th Cir.), *cert. denied*, 95 S.Ct. 1683 (1975); *United States v. Duke*, 527 F.2d 386, 388, 390 (5th Cir.), *cert. denied*, 96 S.Ct. 3177 (1976); *United States v.*

---

[7]In a footnote appended to the first of these sentences, the Court observes that a law review article "has catalogued some of the noninvestigative reasons for delay" and proceeds to quote several passages from the article, including its references to maintenance of an informer's cover, "'other motives . . . including some sinister ones,'" and its reference to the fact that "'various prosecutorial decisions—such as the assignment of manpower and priorities among investigations of known offences—may also affect the length of such delays.'" *Id*. fn.19 (quoting Amsterdam, *Speedy Criminal Trial: Rights and Remedies*, 27 Stan. L.R. 525, 527-28 (1975)). The footnote then gives a "see also" citation to Justice Brennan's concurring opinion in *Dickey v. Florida*, 90 S.Ct. 1564, 1572-73 & n.9 (1970). We observe that the indicated pages of Justice Brennan's concurrence in *Dickey* (in which Justice Marshall, author of *Lovasco*, joined) discuss considerations pertaining to whether the Sixth Amendment's speedy trial guarantee is applicable "to delays occurring *before* arrest or indictment." *Id*. at 1572. Justice Brennan's opinion remarks that "[d]eliberate governmental delay designed to harm the accused, however, constitutes abuse of the criminal process." *Id*. at 1573. In a footnote, Justice Brennan also states, *inter alia*, "Delay, of course, may also result because the government lacks sufficient resources to move more quickly or because it negligently fails to act. When delay is not the result of an intentional attempt to strengthen the government's case, it will very likely make more difficult proof of the accused's guilt." *Id*. n.9.

22

*Scallion*, 533 F.2d 903, 912 (5th Cir. 1976), *reh'g on other grds denied*, 548 F.2d 1168 (5th Cir. 1977), *cert. denied*, 98 S.Ct. 2843 (1978); and *United States v. Manetta*, 551 F.2d 1352, 1354 (5th Cir. 1977). *See also United States v. Croucher*, 532 F.2d 1042, 1044 (5th Cir. 1976).[8]

Since *Lovasco*, the overwhelming majority of our decisions have stated the rule essentially as we had stated it in *Butts*, *supra*. Thus, in *United States v. Willis*, 583 F.2d 203, 207 (5th Cir. 1978), we wrote that to prevail on a claim of preindictment delay "the accused *must* show that: (1) substantial prejudice resulted from the delay *and* (2) the delay was an intentional measure in order to gain a technical advantage." In *United States v. Durnin*, 632 F.2d 1297 (5th Cir. 1980), we rejected a due process claim of preindictment delay on the *sole* basis that the defendant had not shown a motive on the part of the prosecutor to use the delay for tactical advantage, and we did so without even evaluating the presence or extent of prejudice:

> "Appellant alleges that the delay denied him due process because he lost the testimony of an important witness in the interim between when the government could have brought an indictment and when it finally chose to do so. However, to establish a violation of the Due Process Clause in this context, appellant *must show, not only*

---

[8]One of our decisions in this time frame states in its text the rule essentially as stated in *Butts*, *Duke*, and our other above-cited cases, but in a footnote suggests that it could be an open question whether the two requirements as stated in *Butts* might be considered alternative, rather than cumulative, requirements. *United States v. Avalos*, 541 F.2d 1100, 1107 & n.9 (5th Cir. 1976), *cert. denied*, 97 S.Ct. 1656 (1977). However, it is certainly now clear that delay caused prejudice alone does *not* suffice. *Lovasco*, 97 S.Ct. at 2048-49, 2051-52. Hence, the requirements cannot be alternative.

23

substantial prejudice flowing from an inordinate delay, *but also a motive on the part of the prosecutor to use the delay to gain a tactical advantage. . .*[citing *Lovasco, Marion,* and *Willis*]. Appellant does not contend that the government sought to delay his indictment for tactical advantage, and the district court specifically found that the delay resulted from the government's good-faith attempt to ascertain appellant's guilt beyond a reasonable doubt. Trial Transcript, vol. 3, at 78. Since this finding is abundantly supported by the record, the district court's ruling on the motion to dismiss must be affirmed." *Id*. at 1299-1300 (citations and footnote omitted; emphasis added).

More recently, we wrote in *United States v. Byrd*, 31 F.3d 1329, 1339 (5th Cir. 1994), that: "To prove that pre-indictment delay violated his due process rights, a defendant must demonstrate that the prosecutor intentionally delayed the indictment to gain a tactical advantage *and* that the defendant incurred substantial prejudice as a result of the delay." (Emphasis in original). In all, since *Lovasco* at least twenty-nine different judges of this Court—including twenty-five of the thirty-three judges who have served either as active or senior judge of this Court since it split October 1, 1981—have authored, or joined without reservation, unanimous published opinions in some eighteen different cases holding or stating in substance just what we said in *Byrd*, *Durnin*, and *Willis*.[9]

_____

[9]In addition to *Byrd, Durnin,* and *Willis*, the post-*Lovasco* published opinions referred to include: *United States v. Neal*, 27 F.3d 1035, 1041 (5th Cir. 1994), *cert. denied*, 115 S.Ct. 1165 (1995); *United States v. Beszborn*, 21 F.3d 62, 65-66 (5th Cir.), *cert. denied*, 115 S.Ct. 330 (1994); *United States v. Hooten*, 933 F.2d 293, 296 (5th Cir. 1991); *Dickerson v. Guste*, 932 F.2d 1142, 1144 (5th Cir.), *cert. denied*, 112 S.Ct. 214 (1991); *United States v. Delario*, 912 F.2d 766, 769 (5th Cir. 1990); *United States v. Varca*, 896 F.2d 900, 904 (5th Cir.), *cert. denied*, 111 S.Ct. 209 (1990); *United States v. Carlock*, 806 F.2d 535, 549 (5th Cir. 1986), *cert. denied*, 107 S.Ct. 1611 (1987); *United States v.*

We recognize that language to the contrary may be found in a scattered few of our opinions. For example, in *United States v. Brand*, 556 F.2d 1312 (5th Cir. 1977), *cert. denied*, 98 S.Ct. 1237 (1978), we rejected the defendant's preindictment delay claim because he had not demonstrated *any* prejudice. *Id*. at 1316-1317. The *Brand* panel then appended a footnote expressing its disagreement with the government's contention that "both actual prejudice and intentional tactical delay" had to be shown, asserting that instead the validity of a preindictment delay claim "depends on the due process balancing between the extent of the actual prejudice and the governmental interests at stake." *Id*. at 1317 n.7. We did not there engage in any such balancing, however, for we had already found no actual prejudice (nor did we even identify or assess the reasons for the delay or "the governmental interests at stake"). The *Brand* footnote is pure dicta. The panel and the district court placed primary reliance on *Townley*—a quorum decision by two judges—where, in affirming Townley's conviction, we rejected his claim that the district court had erred in overruling his motion to dismiss for preindictment delay. The *Townley* panel concluded that "the lengthy pre-indictment delay

*Johnson*, 802 F.2d 833, 835, 836 (5th Cir. 1986); *United States v. Scott*, 795 F.2d 1245, 1249 (5th Cir. 1986); *United States v. Ballard*, 779 F.2d 287, 293 (5th Cir.), *cert. denied*, 106 S.Ct. 1518 (1986); *United States v. Amuny*, 767 F.2d 1113, 1119-1120 (5th Cir. 1985); *United States v. Wehling*, 676 F.2d 1053, 1059 (5th Cir. 1982); *United States v. Hendricks*, 661 F.2d 38, 39-40 (5th Cir. 1981); *United States v. Nixon*, 634 F.2d 306, 310 (5th Cir. 1981); and *United States v. Ramos*, 586 F.2d 1078, 1079 (5th Cir. 1978). Of course, there are also the numerous post-*Marion*, pre-*Lovasco* cases to the same effect, such as *Butts; Beckham; Duke; Scallion;* and *Manetta*.

somewhat prejudiced Townley," *id*. at 586, but was not due to "bad faith motive to prejudice" him. *Id*. at 581. Relying on *Brand*'s footnote 7, the opinion declined to affirm on that basis, but rather asserted that resolution of the issue "turns upon whether the degree of prejudice thereby sustained by the accused is sufficiently balanced by the good faith reasons advanced by the government." *Townley* at 582. We ultimately concluded that the way the trial had actually unfolded, and particularly the way the government had sought to prove its case, was such that the prejudice to Townley was not sufficiently substantial, when balanced against the reasons for the delay ("the press of other investigations . . . low-priority accorded to the present investigations and . . . changes of governmental prosecuting personnel," *id*. at 581), as to amount to a denial of due process.

*Townley* notwithstanding, it is plain that the vast majority of this Court's opinions have followed the contrary approach as reflected in *Butts, Durnin, Byrd*, and the other opinions cited in note 9, *supra*. Although as an en banc court we are not strictly bound by prior panel decisions, we now choose to follow the vast majority of our prior opinions in this respect and to reject the *Townley* approach.

We recognize that neither *Marion* nor *Lovasco* is crystal clear on this issue, and each opinion contains some language that can give comfort to either view. However, we believe that the better reading of these opinions is that the Supreme Court, in instances where the statute of limitations has not run, has refused to

recognize a claim of preindictment delay absent some bad faith or improper purpose on the part of the prosecution. Both *Marion* and *Lovasco* emphasize that "the primary" protection against preindictment delay is the statute of limitations, and that the due process clause has but "a limited role to play." *Lovasco* at 2048. The only due process violation specifically recognized is where the delay not only "caused substantial prejudice" but also "was an intentional device to gain tactical advantage." *Marion* at 465. *Marion* reversed the dismissal for preindictment delay stating "there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them." *Id*. at 466. *Lovasco* rejects the notion that prejudice from preindictment delay is a sufficient, rather than merely a necessary, condition for relief, *id*. at 2048-49, 2051-52. It likewise rejects the contention that the due process clause proscribes delay beyond the time the prosecution has assembled sufficient evidence to prove guilt beyond a reasonable doubt. *Id*. at 2050-51. *Lovasco* refuses to proscribe investigative delay *because* such "delay is fundamentally unlike delay undertaken by the Government solely 'to gain tactical advantage over the accused.'" *Lovasco* at 2051 (quoting *Marion* at 465). Moreover, *Lovasco*, rather than remanding for reconsideration in light of its principles, flatly held that the dismissal of the indictment was error *despite* the findings of both the district court and the Court of Appeals that the delay not only caused actual prejudice to the accused but was also "'unjustified, unnecessary, and unreasonable,'" *id*. at

27

2047, findings the Supreme Court never expressly disagreed with or determined to be clearly erroneous.[10]  Indeed, both *Lovasco* and *Marion* indicate the undesirability of attempting to make such determinations.  *See, e.g., Marion* at 464 & n.13; *Lovasco* at 2050 & n.14.  Finally, neither *Marion* nor *Lovasco* mentions any "balancing" or "weighing" of the extent of the prejudice against the relative merit of the reasons for the delay.  Indeed, the closest thing to a reference to balancing is *Marion*'s statement that limitations statutes "represent legislative assessments of *relative interests* of the State and the defendant."  *Id*. at 464 (emphasis added).

Crucially, the Supreme Court itself, albeit in dicta, appears to have interpreted *Marion* and *Lovasco* in essentially the same manner as we did in *Byrd*, *Durnin*, *Butts*, and our other cases cited in note 9, *supra*.  Thus, in *United States v. Gouveia*, 104 S.Ct. 2292, 2299 (1984), the Court stated:

> "But applicable statutes of limitations protect against the prosecution's bringing stale criminal charges against any defendant, *United States v. Lovasco*, *supra*, 431 U.S., at 788-789, 97 S.Ct., at 2047-2048; *United States v. Marion, supra*, 404 U.S., at 322, 92 S.Ct., at 464, and, beyond that protection, the Fifth Amendment requires the dismissal of an indictment, even if it is brought within the statute of limitations, *if* the defendant can prove that *the Government's delay* in bringing the indictment *was a deliberate device to gain an advantage over* him *and* that it caused him actual prejudice in presenting his defense.  *United States v. Lovasco*, *supra*, 431 U.S., at

---

[10]Indeed, such disagreement would be most unusual, given the Supreme Court's well-established "two court" doctrine.  *See, e.g., Graver Tank & Mfg. Co. v. Linde Air Products Co*., 69 S.Ct. 535, 538 (1949) (Supreme Court will not "undertake to review concurrent findings of fact by two courts below in the absence of a very obvious and exceptional showing of error").

789-790, 97 S.Ct. at 2048-2049; *United States v. Marion, supra*, 404 U.S., at 324, 92 S.Ct. at 465." (Emphasis added).

More recently, in *Arizona v. Youngblood*, 109 S.Ct. 333 (1988), the Court, in support of its holding that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law," stated that:

> "Our decisions in related areas have stressed the importance for constitutional purposes of good or bad faith on the part of the Government when the claim is based on loss of evidence attributable to the Government. In *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), we said that '[n]o actual prejudice to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them.' *Id*. at 325, 92 S.Ct., at 466; see also *United States v. Lovasco*, 431 U.S. 783, 790, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977)." *Id*. at 337.

A significant majority of our sister circuits appear to now follow the same rule, namely that where limitations has not run dismissal for preindictment delay requires a showing not only of substantial, actual prejudice, but also that the prosecutor intentionally delayed to gain tactical advantage or to advance some other improper purpose. *See, e.g., United States v. Mills*, 925 F.2d 455, 464 (D.C. Cir. 1991), *cert. denied*, 113 S.Ct. 471 (1992) (". . . pre-indictment delay . . . offends due process if the defendant can carry the burden of showing (1) that the government delayed bringing the indictment in order to gain a tactical advantage; and (2) that the delay caused him actual and substantial

29

prejudice");[11] *United States v. Crooks*, 766 F.2d 7, 11 (1st Cir.), *cert. denied*, 106 S.Ct. 421 (1985) ("An indictment brought within an applicable statute of limitations period is, constitutionally speaking, late *only* if the delay significantly prejudices the defendant *and* the government 'intentionally delayed' the indictment 'to gain an unfair tactical advantage or for other bad faith motives'"; emphasis added);[12] *United States v. Hoo*, 825 F.2d 667, 671 (2d Cir. 1987), *cert. denied*, 108 S.Ct. 742 (1988);[13] *United*

---

[11]In support of this statement, *Mills* cites, among other cases, *Gouveia* and our opinion in *United States v. Delario*, 912 F.2d 766, 769 (5th Cir. 1990). *Mills* at 464.

[12]*Crooks* was authored by then Circuit Judge, now Justice, Breyer. Other First Circuit opinions to the same effect as the above passage from *Crooks* and in which then Circuit Judge Breyer concurred include *United States v. Acevedo*, 842 F.2d 502, 504 (1st Cir. 1988); *United States v. Ricciandra*, 788 F.2d 39, 42 (1st Cir), *cert. denied*, 107 S.Ct. 166 (1986); and *United States v. Marler*, 756 F.2d 206, 213 (1st Cir. 1985). These authorities have more recently been reaffirmed in *United States v. McCoy*, 977 F.2d 706, 711 (1st Cir. 1992).

[13]In *Hoo*, the Second Circuit affirmed the denial of defendant's motion to dismiss for preindictment delay, stating:

> "Because appellant has made no showing of an improper prosecutorial motive, however, we find no deprivation of appellant's constitutional rights.
>
> In *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the Supreme Court held that the due process clause requires the dismissal of an indictment because of preindictment delay only when the delay causes 'substantial prejudice' to the defense and the delay is an 'intentional device to gain tactical advantage over the accused.' *Id*. at 324, 92 S.Ct. at 465. . . . In any event, appellant has failed to show that the government had improperly delayed his prosecution in order to gain a tactical advantage." *Id*. at 671.

In his dissent from the denial of *certiorari* in *Hoo*, Justice White noted that the First, Third, Tenth, and Eleventh Circuits, as well

30

*States v. Ismaili*, 828 F.2d 153, 167 (3d Cir. 1987) ("to sustain a dismissal of charges on the grounds of pre-indictment delay pursuant to the Due Process Clause, a defendant must bear the burden of proving two essential facts: (1) that the government intentionally delayed in order to gain some tactical advantage over him, and that (2) this intentional delay caused the defendant actual prejudice"; footnote omitted); *United States v. Brown*, 959 F.2d 63, 66 (6th Cir. 1992) ("This court has consistently read *Lovasco* to hold that 'dismissal for pre-indictment delay is warranted only when the defendant shows [1] substantial prejudice to his right to a fair trial *and* [2] that the delay was an intentional device by the government to gain a tactical advantage'"); *United States v. Sowa*, 34 F.3d 447, 450 (7th Cir. 1994);[14] *United States v. Engstrom*, 965 F.2d 836, 839 (10th Cir.

---

as the Second, "required a showing of prosecutorial misconduct designed to obtain a tactical advantage over the defendant or to advance some other impermissible purpose in order to establish a due process violation," that the Fourth and Ninth Circuits applied a balancing test, and that there were intra-circuit conflicts in the Fifth and Seventh Circuits. *Hoo v. United States*, 108 S.Ct. 742 (1988).

[14]In *Sowa*, the Seventh Circuit stated:

"To establish that a pre-indictment delay violated due process, Sowa must prove that the delay caused actual and substantial prejudice to his fair trial rights, and there must be a showing that the government delayed indictment to gain a tactical advantage or some other impermissible reason. *United States v. Marion*, 404 U.S. 307, 325, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971). . . . The district court . . . found that Sowa had proved actual and substantial prejudice resulting from the delay. . . .

. . . .

31

1992) ("there must be both a showing of actual prejudice and evidence that the delay was purposeful in order to gain a tactical advantage . . . a defendant must meet this two-pronged test"); *United States v. Hayes*, 40 F.3d 362, 365 (11th Cir. 1994) ("In this circuit, the defendant must show that he suffered substantial prejudice and that the delay was the product of deliberate action by the Government to gain a tactical advantage").[15]

We conclude that several other considerations also strongly militate against utilizing a *Townley*-type balancing test to determine whether prejudicial preindictment delay violates due process and in favor of requiring that the delay have been intentionally caused by the prosecution to gain a tactical

---

Sowa's claim, however, fails to meet the requirements of the second prong. With respect to the government's delay, due process is only implicated if the government purposely delayed the indictment to take advantage, tactically, of the prejudice or otherwise acted in bad faith." *Id*. at 450.

[15]In *United States v. Stierwalt*, 16 F.3d 282, 285 (8th Cir. 1994), the Court rejected the defendant's claim of preindictment delay, stating "[u]nless there is a showing that the government intentionally delayed indictment to harass or to gain a tactical advantage, there can be no due process violation." The court also observed that "there is no intimation that the preindictment delay was intentional and designed to gain a tactical advantage over or to harass Stierwalt". The rule is similarly stated in *United States v. Scoggins*, 992 F.2d 164, 166-167 (8th Cir. 1993). However, in *United States v. Miller*, 20 F.3d 926 (8th Cir.), *cert. denied*, 115 S.Ct. 226 (1994), the Court, without citing *Stierwalt* or *Scoggins*, stated that if actual prejudice is established "the court will then inquire into the reasons for the delay and balance those reasons against the demonstrated prejudice." *Id*. at 931. The Court ultimately affirmed the conviction, and stated in a footnote concerning periods of delay not "due to legitimate investigatory needs" that those "appear to be due to administrative delays, inertia or at worst negligence. We agree with the magistrate's finding that 'there was absolutely no evidence that the delay was for strategic reasons.'" *Id. & n.5.*

advantage over the defendant or for some other bad faith purpose.

The *Townley* test purports to weigh or balance the extent or degree of the actual prejudice against the extent to which the government's "good faith reasons" for the delay deviate from what the court believes to be appropriate.[16] However, what this test seeks to do is to compare the incomparable. The items to be placed on either side of the balance (imprecise in themselves) are wholly different from each other and have no possible common denominator that would allow determination of which "weighs" the most. Not only is there no scale or conversion table to tell us whether eighty percent of minimally adequate prosecutorial and investigative staffing is outweighed by a low-medium amount of actual prejudice, there are no recognized general standards or principles to aid us in making that determination and virtually no body of precedent or historic practice to look to for guidance. Inevitably, then, a "length of the Chancellor's foot" sort of resolution will ensue and judges will necessarily define due process in each such weighing by their own "'personal and private notions' of fairness," contrary to the admonition of *Lovasco*.

Apart from the above difficulty, grounding a due process violation on the basis of good faith but inadequate, ineffective, or insufficient governmental personnel or management leading to preindictment delay runs counter to two basic constitutional principles. In the first place, "[h]istorically, this guarantee of

---

[16]Inferentially, *Townley* would also grant relief whenever any actual prejudice resulted from delay intentionally caused to gain tactical advantage.

33

due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property," *Daniels v. Williams*, 106 S.Ct. 662, 665 (1986), and hence "the Due Process Clause . . . is not implicated by the lack of due care of an official causing unintended injury to life, liberty or property." *Davidson v. Cannon*, 106 S.Ct. 668, 670 (1986).[17] Contrary to these principles, however, the *Townley* test would find a due process violation where the government acted in good faith and did not deliberately seek to prejudice the party ultimately accused.

Finally, serious separation of powers concerns are implicated.

---

[17]Crouch and Frye argue by analogy to the rule of *Brady v. Maryland*, 83 S.Ct. 1194 (1963), that a prosecutor's suppression of exculpatory evidence violates due process "irrespective of the good faith or bad faith of the prosecution." *Id*. at 1196. *Brady*—which relates to post-indictment conduct by the prosecution—might be a more cogent analogy if urged to support a contention that Sixth Amendment speedy trial rights are violated by prosecutorial post-indictment delay irrespective of the good faith or bad faith of the prosecution. With arrest or indictment, a variety of constitutional rights arise, as do more at trial itself. But, as *Marion* and *Lovasco* make clear, the primary protection against undue prearrest and preindictment delay is the statute of limitations, and the Due Process Clause has but a limited role to play in that respect. There is no general common law or constitutional duty to bring charges as soon as reasonably practicable, and it has long been recognized that preindictment delay generally favors the defense. *See, e.g., United States v. Davis*, 487 F.2d 112, 119 (5th Cir. 1973), *cert. denied*, 94 S.Ct. 1573 (1974) ("'all practiced trial lawyers are well aware that the attrition from such delay is more damaging to the prosecution's case than to that of the defense. This will be so as long as the prosecution has the burden of proof.'"). Hence, the rule of *Arizona v. Youngblood*, 109 S.Ct. 333, 337 (1988), that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process," provides a more apt analogy than that of *Brady*, as the Supreme Court itself recognized in *Youngblood* by citing *Marion* and *Lovasco* in support of its said holding.

Here, for example, the panel concluded that the reasons for the delay—"lack of manpower and the low priority which this investigation was assigned"—were "insufficient to outweigh the actual prejudice to Crouch and Frye." *Crouch* at 483.[18] Finding these reasons "insufficient" is in substance determining that greater manpower *should* generally have been allocated to investigation and prosecution in that jurisdiction, and that a higher priority *should* have been assigned to this particular investigation.[19] Yet those decisions are ones essentially committed to the legislative and executive branches, and the case for judicial second guessing is particularly weak where it is directed at preindictment conduct and is supported not by any specific constitutional guaranty or by any long-established tradition of judicial oversight, but only by the general contours of the due process clause.

For example, the government has cited to us the following observations in a report of the House Committee on Government

---

[18]Similarly, the *Townley* panel accepted that much of the delay "was occasioned by the low priority assigned to this investigation and to the overload of other investigative and prosecutive responsibilities allocated to the available personnel," *Townley* at 582, and also "because of changes of government prosecuting personnel." *Id*. at 581. The panel indicated that had the accused not been only "somewhat" actually prejudiced—as it developed after trial—these reasons would have been insufficient and a due process violation would have occurred.

[19]If all the manpower that could reasonably be expected has been furnished and the highest reasonably appropriate priority has been assigned to the matter in question, but a due process violation has nevertheless been found despite the delay's being caused only by the insufficient manpower and the relative priority assigned to the matter, then the due process violation must necessarily rest on prejudice alone, contrary to *Lovasco*.

Operations issued some ten months before FIRREA extended the presently relevant limitations period to ten years,[20] *viz*:

> "19.     a. Pending bank fraud investigations are overwhelming the Federal criminal justice system.  There are acute shortages of sufficiently compensated and experienced prosecutors and investigators in most areas of the nation to handle these more complex cases.
>
> b.  Timely investigations and/or prosecutions of many of the 3,340 pending FBI investigations involving losses of $100,000 or more is highly improbable, if not impossible, without a substantial increase in the Justice Department's static budget."[21]

In response, Crouch's brief cites, *inter alia*, a 1990 report of the same House Committee,[22] which he characterizes as having "found that shortages of personnel for the investigation and prosecution of such fraud and embezzlement (F&E) cases were the result of the failure of the Executive Branch and the Department of Justice to request sufficient finding and to assign appropriate priorities."

What are we to make of all this?  Are we to say that there would be no due process violation if the President had vigorously and timely requested additional funds to investigate and prosecute these cases, but Congress had refused?  Or, that even so we will find a due process violation because Congress shouldn't have refused?  Of course, funds must come from somewhere.  Are we to say that such additional funding is better than increasing taxes or the

___

[20]See Pub. L. 101-73, Title IX, § 961(l)(1), Aug. 9, 1989, 103 Stat. 501; 18 U.S.C. § 3293.

[21]2 Pulles, Whitlock, and Hogg *FIRREA:  A Legislative History and Section-by-Section Analysis* Title IX (McGraw-Hill 1993) (quoting House Report 100-1088, October 18, 1988).

[22]H.R. Rep. No. 101-982, 101st Cong., 2nd Sess. (1990).

deficit or decreasing funding for some other programs?  Are we to judge whether financial institution fraud should be assigned a higher priority than drug or other offenses?  It seems to us that all those decisions are quintessentially the business of either the legislative or the executive branch, or both, rather than the judiciary.  Yet, a *Townley* approach—so long as it actually tries to "balance" or "weigh" instead of merely find a due process violation on the basis of the extent of the prejudice alone—inevitably involves us in grading or evaluating the merit of resource allocation and management decisions that are properly the province of the executive and/or legislative branches.  Delay due to such causes is fundamentally unlike intentional delay to gain tactical advantage or for other improper purpose.

Accordingly, we reject the *Townley* balancing test and hold that for preindictment delay to violate the due process clause it must not only cause the accused substantial, actual prejudice, but the delay must also have been intentionally undertaken by the government for the purpose of gaining some tactical advantage over the accused in the contemplated prosecution or for some other impermissible, bad faith purpose.[23]  We need not now attempt to

---

[23]Intentional delay for the purpose of gaining tactical advantage would include delay for the purpose of rendering unavailable evidence favorable to the defense or which would tend to undercut the government's case.  But, it would not include delay to affirmatively strengthen the government's case—such as delay until a potential witness for the government becomes available by reason of a plea bargain or the like—even to a level well beyond that reasonably thought necessary to preclude the granting of a post-verdict motion for judgment of acquittal under Fed. R. Crim. P. 29(c) (and such a purpose would not be impermissible).

37

catalogue all possible "other" impermissible, bad faith purposes of intentional delay, although *Marion* indicates that a purpose "to harass" the defendant would be included.  *Id*. at 466.[24]  As suggested by *Marion* and *Lovasco*, we leave that to further case-by-case development.

We turn now to the prejudice component of the due process claim.

Prejudice Requirement

**General Principles**

As noted, we agree with the panel's holding, 51 F.2d at 483-84, that the district court erred in concluding that the length of preindictment delay established substantial presumptive prejudice.[25] All our precedents, as well as a fair reading of *Marion* and *Lovasco*, plainly indicate that actual, not presumptive, prejudice must be shown where complaint is made of preindictment delay. *See, e.g., United States v. Wehling*, 676 F.2d 1053, 1059 (5th Cir. 1982); *United States v. McGough*, 510 F.2d 598, 604 (5th Cir. 1975) ("when preindictment delay is asserted, actual prejudice and not merely the real possibility of prejudice inherent in any extended delay is a necessary element which must be shown"); *Butts* at 977 ("[t]he mere passage of time [does] not constitut[e] the type of

---

[24]Neither Crouch nor Frye has alleged any specific such "other" impermissible, bad faith purpose.

[25]The magistrate judge, whose report the district court approved and adopted as modified and supplemented by its opinion, likewise found such presumptive prejudice.  And the magistrate judge and the district judge each also appears to have combined the presumed prejudice with the actual prejudice found and then weighed the total against the government's reasons for the delay.

actual prejudice necessary to set aside an indictment returned within the appropriate statute of limitations"). The district court's reliance on the Supreme Court's *Doggett* decision was misplaced because *Doggett* was a Sixth Amendment post-indictment delay case. *See United States v. Beszborn*, 21 F.3d 62 at 66 (5th Cir.), *cert. denied*, 115 S.Ct. 330 (1994).[26] *See also, e.g., Byrd* at 1339; *United States v. Bischel*, 61 F.3d 1429, 1436 (9th Cir. 1995).

---

[26]We explained in *Beszborn*:

> "The law is well settled that it is actual prejudice, not possible or presumed prejudice, which is required to support a due process claim. The applicable statute of limitations is the mechanism established by law to guard against possible, as distinguished from actual, prejudice resulting from the passage of time between crime and the charge, protecting a defendant from overly stale criminal charges. *United States v. Ewell*, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966); *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971).
>
> The concept of presumed prejudice has no place in a due process analysis, and the district court's reliance on *Doggett* is misplaced. *Doggett* was a case involving a Sixth Amendment speedy trial violation claim, due to post-indictment delay, rather than pre-indictment delay. The proper measure of a claim of prejudice due to pre-indictment delay is the due process standard of the Fifth Amendment, which requires a showing of actual prejudice. . . .
>
> The Supreme Court was clear in its directive that, "There is no need to . . . guard against mere possibility that . . . delays will prejudice the defense . . . since statutes of limitation already perform that function." *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)." *Id*. at 66.

Moreover, preindictment delay generally tends to favor the defense, not the prosecution. *See, e.g., United States v. Davis*, 487 F.2d 112, 119 (5th Cir. 1973), *cert. denied*, 94 S.Ct. 1573 (1974).

The prejudice to be shown not only must be actual, rather than presumed or potential, but must also be "substantial." *See, e.g., Marion* at 465 ("substantial prejudice"); *United States v. West*, 58 F.3d 133, 136 (5th Cir. 1995) ("actual and substantial prejudice"); *United States v. Royals*, 777 F.2d 1089, 1090 (5th Cir. 1985) ("actual and substantial prejudice"); *Wehling* at 1059 (5th Cir. 1982) ("'substantial prejudice,'" quoting *Marion*); *United States v. Willis*, 583 F.2d 203, 207 (5th Cir. 1978) ("substantial prejudice"); *Butts* at 977 ("substantial prejudice"); *Beckham* at 1319 ("substantial actual prejudice"). Speculative prejudice does not suffice, *United States v. Parks*, 68 F.3d 860, 868 (5th Cir. 1995), and "[v]ague assertions of lost witnesses, faded memories, or misplaced documents are insufficient." *Beszborn* at 67. *See also West* at 136; *Royals* at 1090; *Wehling* at 1059. A mere loss of potential witnesses is insufficient absent a showing that their testimony "would have actually aided the defense." *Beszborn* at 66. *See also West* at 136; *Royals* at 1090; *Wehling* at 1059; *United States v. McGough*, 510 F.2d 598, 604 (5th Cir. 1975) ("death of some six potential defense witnesses," some of whom the defendant claimed "would have testified as to firsthand knowledge of several of the transactions" involved).[27] Moreover, to establish prejudice based on lost witnesses or documents, the defendant must also show that "the information . . . could not otherwise be obtained from other sources." *Beszborn* at 67. *See also Royals* at 1090

---

[27]And, of course, loss of witnesses or documents occurring before delay becomes improper are not considered. *See, e.g., Parks* at 868. *Cf. Walters v. Scott*, 21 F.3d 683, 688-89 (5th Cir. 1994).

40

("[D]efendant has failed to show that such evidence could not have otherwise been obtained").

That actual, substantial prejudice—not merely possible or potential prejudice—must be shown is also consistent with the nature of the due process right in question. That right is one not to be "deprived of life, liberty, or property, without due process of law." U.S. Const., Amend. 5. In the present context, deprivation will normally occur only by conviction, and not simply by trial itself. *Cf. Olim v. Wakinekona*, 103 S.Ct. 1741, 1748 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement"). In *United States v. MacDonald*, 98 S.Ct. 1547, 1553 (1978), the Supreme Court held that "[u]nlike the protection afforded by the Double Jeopardy Clause, the Speedy Trial Clause does not . . . encompass a 'right not to be tried' which must be upheld prior to trial if it is to be enjoyed at all." The same conclusion applies, *a fortiori*, to due process claims of preindictment delay. We are aware of no authority to the contrary. The Supreme Court further stated in *MacDonald*:

> "Before trial, of course, an estimate of the degree to which delay has impaired an adequate defense tends to be speculative. . . . The essence of a defendant's Sixth Amendment claim in the usual case is that the passage of time has frustrated his ability to establish his innocence of the crime charged. Normally, it is *only* after trial that that claim may fairly be assessed.' *Id*. at 1552 (emphasis added).

This, too, fully applies to claims of preindictment delay. The denial of relief before trial in no way precludes the accused, if

41

convicted, from successfully demonstrating that the undue and improper preindictment delay substantially and unfairly prejudiced his ability to avoid that result. Thus in *Marion*, the Court reversed the pretrial dismissal for preindictment delay, but observed that "[e]vents of the trial may demonstrate actual prejudice, but at the present time appellees' due process claims are speculative and premature." *Id*. at 466.[28] *See also MacDonald* at 1552 ("The denial of a pretrial motion to dismiss an indictment on speedy trial grounds does not indicate that a like motion made after trial—when prejudice can *better* be gauged—would also be denied"; emphasis added).

Necessarily, then, a far stronger showing is required to establish the requisite actual, substantial prejudice pretrial than would be required after trial and conviction. Indeed, it is difficult to imagine how a pretrial showing of prejudice would not in almost all cases be to some significant extent speculative and potential rather than actual and substantial. We are aware of no reported federal appellate decision since *Lovasco* that has sustained a pretrial dismissal for preindictment delay where the

---

[28]We observe that the *Lovasco* Court, while reversing the dismissal prior to trial for preindictment delay, commented in a footnote that the government contended "that the District Court should have deferred action on the [defendant's] motion to dismiss [for preindictment delay] until after trial, at which time it could have assessed any prejudice to the respondent [defendant] in light of the events at trial." *Id*. at 2048 n.7. The Court declined to address the merits of this contention because it "was not raised in the District Court or in the Court of Appeals." *Id*.

statute of limitations had not run.[29]  This is not to say that a motion to dismiss on such a basis should not be filed and initially considered prior to trial.  *Cf*. Fed. R. Crim. P. 12(b)(1) & (2). However, at least in all but the very clearest and most compelling cases, the district court, rather than grant such a motion prior to trial, should carry it with the case, and make the determination of whether actual, substantial prejudice resulted from the improper delay in light of what actually transpired at trial.[30]  A number of reported decisions in this and other circuits reflect such a method of proceeding.  *See, e.g., Townley* at 581 (motion to dismiss considered at pretrial hearing, district court reserved ruling and subsequently denied motion after conclusion of the evidence; we affirmed); *United States v. Scott*, 579 F.2d 1013 (6th Cir. 1978) (motion to dismiss two counts of three-count indictment denied without prejudice prior to trial, granted after close of all the evidence, jury acquittal on remaining count; affirmed).  *Cf. United States v. Glist*, 594 F.2d 1374 (10th Cir. 1979) (motions to dismiss

---

[29]And, we are aware of only one such case prior to *Lovasco*, a 1976 decision by a divided panel of the Eighth Circuit in *United States v. Barket*, 530 F.2d 189 (8th Cir. 1976).  Shortly after *Barket*, another divided panel of the Eighth Circuit sustained the pretrial dismissal of three counts of a four-count indictment on a due process, preindictment delay basis, but was reversed by the Supreme Court in *Lovasco*.

[30]Moreover, where the claim of preindictment delay is ruled on prior to trial, the defense, which will frequently be in the best position to find or unearth exculpatory evidence allegedly lost due to delay or evidence that may adequately replace or substitute for it, has every incentive *not* to diligently search for or produce such evidence.  At trial, however, the incentive is just the opposite.  Then, if the evidence or some adequate substitute is not produced, we can have far more confidence that it really could not have been.

for preindictment delay taken under advisement prior to trial and granted as to one of four counts after five days of trial; affirmed).[31]

*Townley* presents an instructive example of how a strong pretrial showing of substantial prejudice may ultimately dissolve in the unfolding of the actual trial itself. Townley and his partner Owens were charged with mail fraud in connection with inducing persons to purchase and invest in nonexistent vending machines. *Townley* at 582. Townley claimed that due to preindictment delay he was unable to show that he had really believed the machines would be produced and be a valuable investment for the purchasers. We concluded that the requisite substantial prejudice would have been shown "had the thrust of the government's case" as presented at trial "been that Townley well knew that he and Owens could not deliver the machine sold or that the scheme could not be successful." *Id*. at 583. We found no such substantial prejudice, however, *because* "the main thrust of the government's case," as presented at trial, "concerned [particular] misrepresentations made by Townley in the sale of the machines." *Id*. Townley also claimed prejudice from being unable to adequately

---

[31]Although it appears that in at least some of these cases the motion was ruled on prior to verdict, normally the much better practice will be to await the verdict rather than to dismiss—particularly where dismissal would be of an entire count forming a substantial part of the indictment—preverdict. This will allow the government to appeal the dismissal in the event of a guilty verdict (if the verdict is not guilty, the issue is moot) and, should the dismissal be set aside on appeal, will obviate the necessity of a new trial (which in any event might raise double jeopardy concerns).

corroborate his testimony that, as soon as he discovered Owens'
fraud, he took action to protect the investors. We rejected this
based on the approach taken by the government at trial:

> "Insofar as counsel was unable to corroborate Townley's
> testimony that (after he had discovered Owens' fraud) he
> had informed the financing company not to approve any
> further applications for credit by investor-purchasers,
> the government expressly stated it would not dispute
> Townley's testimony, and neither by argument nor evidence
> did it attempt to cast doubt upon this creditable act by
> Townley or upon his two customer-witnesses whose
> testimony tended to corroborate him. The government
> further made full disclosure of its files to Townley's
> attorney to aid him in the preparation of the defense."
> *Id*. at 585-86 (citation omitted).

And, we observed that the government did not use but "had
available" a witness "who would have cast doubt on Townley's
exculpatory testimony." *Id*. at 586. We accordingly affirmed the
district court's decision, after the close of all the evidence, to
deny Townley's pretrial motion to dismiss for preindictment delay.

Similarly instructive is our opinion in *McGough*, reversing the
district court's pretrial dismissal on account of preindictment
delay. We described the defendant's claim as follows:

> "McGough's assertion of actual prejudice to his
> defense is based primarily upon the death of some six
> potential defense witnesses. Some of these witnesses,
> McGough claimed, would have testified as to firsthand
> knowledge of several of the transactions which entered
> into the government's calculation of the amount
> understated; the testimony of others might impeach
> government witnesses. . . . [T]he government asserted at
> the hearings that it had expected two of them to be
> government witnesses, rather than witnesses for the
> defense." *Id*. at 604.

Although we could "find no indication that the trial court weighed
the contradictory factual assertions before stating that there was
actual prejudice," *id*. at 604, we nevertheless did *not* remand for

45

further findings in that respect, but rather ordered that "the case is remanded for a prompt trial." *Id.* at 605. In this respect we quoted *Marion*, 92 S.Ct. at 466: "Events of trial may demonstrate actual prejudice, but at the present time appellees' due process claims are speculative and premature." *Id*. at 604-5. *See also, e.g., Robinson v. Whitley*, 2 F.3d 562, 571 (5th Cir. 1993), *cert. denied*, 114 S.Ct. 1197 (1994); *United States v. Rice*, 550 F.2d 1364, 1369 (5th Cir.), *cert. denied*, 98 S.Ct. 478, 479 (1994).[32]

**Prejudice in this case**

At this stage of the proceedings, any claim that Crouch and Frye will suffer actual and substantial trial prejudice from the preindictment delay—let alone be convicted—is purely speculative and unsupported by the record. So far as actual prejudice is concerned, there is simply no basis on which to conclude that this case will not be another *Townley*.

Crouch's main claim is that the delay caused him to lose the testimony of six witnesses who had died prior to the July 1993 hearing before the magistrate judge, namely: his father, who died in June 1992; Gubert, who died at some unspecified time in 1988;

---

[32]In *Robinson*, the habeas petitioner claimed that the post-indictment delay caused him to lose two witnesses, one having died and the other no longer locatable, who "would have corroborated the 'alibi' he presented at trial." We rejected this claim, stating, "By the trial's end, however, the prosecution had managed to blow so many holes in Robinson's alibi that the only effect their testimony would have had would be to have transformed Robinson's alibi from an incredibly tall tale to just a tall one." *Robinson*, 2 F.3d at 571. In *Rice*, in rejecting a preindictment delay claim, we observed, concerning the defendant's claim (pretrial) that the delay had allowed the government to procure evidence against him, that at trial "[n]o such later acquired evidence was ever offered against any of the defendants." *Rice*, 550 F.2d at 1369.

Tschearner, an employee of Bankers, who died at a wholly unspecified time before return of the indictment; Levy, a Bankers outside director and chairman of its loan and executive committees who also died at a wholly unspecified time before the indictment; Carson, chairman of Vision Bank, who died in October 1992; and John Connally, who died June 15, 1993.

As to Levy and Tschearner, so far as this record discloses, they may well have died in 1987 or 1988, prior to any delay having become even arguably undue, and hence their "loss" could not be attributable to any improper delay. The same is true of Gubert, who for all this record shows may have died in January 1988. Moreover, there was no adequate showing that these three individuals could have contributed any testimony that was material or related to matters that could not otherwise be established. Levy was not claimed to have any knowledge at all of—much less any participation in—any of the transactions at issue. He would simply have testified how an outside director of a savings and loan association typically functioned and relied on management. There is no suggestion that similar testimony was not otherwise readily available. Tschearner, as a Bankers' employee, negotiated with Ferguson concerning his purchase from Bankers of its REO tracts, and, according to Crouch, would have testified that the only people Ferguson mentioned to Tschearner as individuals at Delta with whom Ferguson dealt were Gerjes and Erskine, and that Crouch was not mentioned. But this is not necessarily contrary to the government's theory of the case, and there is nothing to suggest

47

that Ferguson will give contrary testimony or will not, indeed, confirm Tschearner's putative testimony that Ferguson did not mention Crouch to Tschearner. Further, Tschearner is not shown to have had any other knowledge of or connection with the transactions at issue, and Fieselman, Bankers' then president who signed on behalf of Bankers all the papers for its signature in the transactions in question, was alive and available to testify.[33] As to Gubert, there was absolutely no showing or claim that he had any knowledge of or participation in any of the transactions in question. His putative testimony is essentially the same as that of Crouch's father, discussed below, and is insufficient to show prejudice for the same reasons.

Crouch's father died in June 1992, and accordingly the loss of his testimony—unlike that of Levy, Tschearner, and Gubert—is doubtless fairly attributed to any delay here that may be found undue and improper. However, Crouch does not claim that his father—who was not shown to have been a Delta officer, employee, or director at any of the times referenced in the indictment—ever had any knowledge whatever of, or in any way participated in, any of the charged transactions. Many of the matters Crouch says his father could have testified to—such as that Crouch, though a Delta director and chairman of its board, was not a Delta officer or employee and did not have an office on Delta premises, and that his

---

[33]It was also asserted that Tschearner could testify as to the then value of the Bankers REO tracts. However, there is no claim that this information was not reasonably available from other sources; nor can the actual significance of such testimony be assessed on the basis of this record.

48

father had testified against Gerjes in the bonus case—appear to be essentially undisputed as well as easily established by other evidence. While Crouch states his father would testify that "Gerjes misled my father, myself, other directors and shareholders of Delta," this is only of attenuated relevance at best, as it does not concern any of the transactions at issue. Moreover, there is no claim that similar testimony is not available from others of the several Delta directors.[34] For example, this is what the FHLB report of examination relates that Cholakian (who succeeded Gerjes as president and had been a director since 1982) told the examiner, and there is nothing to indicate Cholakian is not available to so testify. Moreover, as noted, Gerjes, already convicted of taking illegal "bonuses" on Delta loans, may well admit to some misleading of Delta board members. We further observe that ample impeachment of Gerjes is available, wholly apart from any testimony of Crouch's father, by showing Gerjes' two prior convictions, his plea bargain, his involuntary termination from Delta, and the fact that Crouch's father testified against him, and Crouch was prepared to, in his 1989 bonus case conviction.

Crouch's fifth missing witness, Corson, had been chairman of Vision Bank, an institution not claimed by anyone to have any involvement whatever in the instant transactions. Nor does Crouch claim that Corson had any knowledge whatever of, or any participation in, any of the instant transactions. Crouch

---

[34]These same observations apply equally to Crouch's assertion that his father would testify "I had to rely on what the officers of the association told me."

apparently thought Corson could have testified to wholly unrelated and unexplained Florida real estate transactions—occurring both before and after the transactions here at issue—involving Ferguson and Delta officer Erskine, to show "the type of person" each of them "is." Such unrelated transactions are at best of the most attenuated relevance. Moreover, Ferguson has already pled guilty to offenses involving the instant transactions, so his willingness to do that sort of thing is hardly inconsistent with the government's likely proof at trial. Nor is there any indication that Ferguson would deny his involvement in the Florida transactions, the nature of which is in any event wholly unexplained. This is likewise the case as to Erskine; indeed, there is no indication Erskine will likely testify.

Finally, Crouch claims John Connally, who died June 15, 1993, after a brief illness, would have been a favorable witness. It is unclear, however, that the loss of this witness is attributable to preindictment delay. Crouch was aware he might well be indicted about fifteen months before John Connally died, but apparently took no steps to interview him or the like. Moreover, the original trial setting in this case was for a time several months before June 15, 1993, and there is nothing to suggest John Connally would have been unavailable at the earlier trial setting. Nor is there any showing that his testimony would have been favorable. Crouch said "I feel like" Connally would have testified he did not consider himself or the Barnes-Connally partnership liable for the Delta loans to Mark Connally because John Connally's financial

50

statement of some six months after the loans closed did not list them as liabilities. However, there is no showing that this financial statement is unavailable. Nor is there any suggestion that either Mark Connally or Ben Barnes or the government will dispute that John Connally did not ever consider himself or his partnership with Ben Barnes liable on the Delta loans to Mark Connally. Indeed, the government represented at the hearing before the magistrate judge that "the people from Austin who were involved in this case were Ben Barnes and Mark Connally, not John Connally." There is no basis to assume, prior to trial, that the trial evidence will show otherwise. At this stage it is simply impossible to tell whether John Connally's absence would substantially prejudice the defense.

To the extent that Crouch may have lost any witnesses due to improper delay, he has not shown any resulting actual, substantial prejudice, and his claims of prejudice are essentially speculative and premature. As to lost documentation, Crouch's motion to dismiss admits that "the Defendant cannot point to the loss of any significant documents at this time." And, there is no showing that any of the loan documents or closing papers are missing.[35]

Frye did not testify at the evidentiary hearing. Frye's

---

[35]While Crouch's briefs and argument suggest that minutes of loan committee meetings are missing, such is not established by the record. At the hearing, a documents custodian testified it would probably take a search of about two weeks duration to determine if those minutes could be located. Just what Crouch hoped to show by those minutes is unclear, and there is certainly nothing to suggest that Crouch will not be able to show that the minutes did not reflect nominee loans.

51

former secretary, who came to work for him in March 1987, testified that in September 1990, when he moved to a smaller office, she threw away all his office files (except accounting files). Frye had customarily made notes of telephone conversations and put them in these files. She had never heard of Delta before Frye testified at the grand jury on November 1992.[36] She did not know whether or not the Frye office files thrown away in 1990 included any related to the transactions involved in the indictment. When asked if she knew whether Frye had any files at his house, she replied, "I don't think so, but I can't say yes or no." It appears that all the loan documents, including closing statements and records showing disbursements, are available, and Frye does not contend otherwise, except in two particulars.[37]

First, the loan documents include a Memorandum of Profit Participation Agreement, executed by Ferguson C&D, Inc. and Frye's J.M.G. Corporation in recordable form, reflecting that Ferguson C&D, Inc. had a profit participation in one of the Delta REO tracts Frye purchased, but not specifying the parties' respective

---

[36]On cross examination she said she was unaware that after March 1987 Frye was involved "in a countersuit" respecting a four million dollar loan at Delta. The record indicates that that matter was settled by the property Frye purchased (as alleged nominee for Ferguson) being conveyed back to Delta.

[37]Frye's motion to dismiss for preindictment delay also mentions five witnesses whom it asserts Frye is unable to locate, but does not allege what they could have testified to; the motion likewise alleges that Frye's attorney at the time of the transactions (one Higgs) is now unable to recall them. The motion is not verified and no evidence supporting any of those allegations was offered at the hearing before the magistrate judge.

percentages of profits.[38]  Attorney Johnson testified that this document, and certain other of the loan documents pertaining to transactions between Frye and Ferguson (including a note and deed of trust, in which Johnson was named trustee, and a letter from Delta to Ferguson C&D, Inc.), appeared to have been prepared by him, as they bore his typed initials and their format and style were consistent with his usual drafting of such documents.  Johnson at the time the loans closed was with the Phillips, King, Smith & Wright law firm, which he subsequently left in March 1989, and one of the closing statements shows that firm's fees were paid at closing by Frye.  Johnson testified he had no recollection of any of the transactions or of being at the closing, had never met or known either Ferguson or Frye or Crouch, and did not know whom he was representing in preparing the documents.[39]  He stated that he does not now have any file on any of these transactions, and does not now recall whether he ever had such file.  He never threw away any files pertaining to Frye, Ferguson, or Delta.  He had "no idea" whether the firm he was with at the time has any files on the transactions in question.  Attorney King—who had represented Frye in the early stages of this prosecution and sat with him at the hearing before the magistrate judge—was a partner in the same law firm with Johnson at the time of the transactions in question, but

---

[38]There is no evidence as to whether or not this Memorandum (or a duplicate of it) was actually recorded.

[39]That Frye apparently paid his fee did not necessarily mean he was representing Frye.  Johnson did not know whether his then firm had ever represented Frye.

left the firm sometime before Johnson did.  Johnson testified that "ordinarily" a Profit Participation Agreement, specifying the profit percentages of the parties, would accompany a Memorandum of Profit Participation Agreement, but he had no independent recollection of ever having prepared or seen a Profit Participation Agreement as referred to in the Memorandum.

Frye argues that he has been prejudiced because the Profit Participation Agreement itself has been lost, and it would indicate that he was not a mere nominee for Ferguson.  There are several answers to this.  In the first place, there is no direct evidence that such an agreement ever existed; certainly there is no testimony that it did.  Conversely, there is nothing to indicate that the government will take the position that there was no such agreement, or that Ferguson will not admit that such an agreement existed (or that Ferguson or Frye himself cannot testify to the essential terms of the agreement).  Indeed, there is no evidence that such an agreement, if it ever existed, cannot be produced at trial.  There is no evidence that Ferguson does not have the agreement—or, indeed, that Frye does not—or that any effort had been made to search the files of the law firm Johnson was with at the time of the transactions.[40]  Finally, there is nothing to suggest that the agreement itself would be substantially more helpful to Frye than the Memorandum.  The crux of the point Frye seeks to make—that he retained a continuing interest in the

---

[40]While Johnson's testimony suggests that the firm had dissolved not long after he left in March 1989, he also stated that he knew "they stored some files off campus."

property with Ferguson—is made by the Memorandum itself. At this stage, Frye's claim of prejudice respecting the alleged Profit Participation Agreement is essentially speculative.

Frye's second claim of prejudice relates to the original of "a waiver of notice of special meeting of directors" of Frye's J.M.G. Financial Corporation that was submitted in connection with the application to Delta for the $3,950,000 loan to Frye and J.M.G. to purchase Delta REO. The government had apparently been unable to locate the original of the waiver of notice, but had a Xerox copy of it as purportedly signed by attorney Dunn. It also appears that Dunn had informed the authorities that he had not signed the document and that his purported signature on it was not in fact his. Frye asserts that the loss of the original is prejudicial because handwriting analysis cannot be performed on a copy to show that Frye did not forge Dunn's signature.[41] This is assertedly

_____

[41]This contention is entirely based on FBI Agent Kettler's testimony as follows:

"Q. [Frye's counsel] All right. Tell me whether or not you have ever presented this document to the FBI for a handwriting analysis to determine whether Mike Frye was or was not the author of this thing that purports to say Abe Dunn.

A. No, we haven't

Q. And tell the Court why you haven't.

A. It's a copy.

Q. And you can't do a handwriting analysis not from a copy?

A. Not very well."

In response to Frye's counsel's further suggestion that "we

relevant to count 18, which charges Crouch and Frye with false statements to Delta in connection with its $3,950,000 loan to Frye, contrary to section 1014, because

> "[t]he [loan] application and corporate minutes were materially false in that they purport to represent the intent of the defendant Michael J. Frye that he and his corporation be held liable for repayment of the debt, when the defendants [Crouch and Frye] then and there well knew that defendant Michael J. Frye was a mere nominee borrower who believed himself and his company to have no actual liability on the note. Additionally, the corporate minutes were false in that no such director's meeting was actually held."[42]

Again, Frye's claims of prejudice in this connection are at this stage speculative at best. To begin with, there is simply no sufficient showing that a handwriting analysis could not be performed, and indeed none had even been attempted (see note 41, *supra*). Moreover, there is absolutely nothing to indicate that the government will make any attempt to prove that Frye forged Dunn's signature, or even that Dunn's purported signature was not his.

_____

can't even submit it for a handwriting analysis," Kettler responded:

> "A. I'm not saying that. There may be some handwriting analyses people that will work with copies, but our people in our laboratory prefer originals.
>
> Q. And in fact, they won't work with copies; right?
>
> A. I don't know. I doubt it, but I don't know for sure. I don't think they would."

There was no evidence that any handwriting expert had ever examined the copy or opined that no handwriting analysis could be based on it.

[42]Count 18 also alleged that the purpose of this "nominee loan" was "to avoid loans to one borrower limitations." As previously indicated, the government's theory of the case was that the real borrower, for whom Frye was nominee, was Ferguson.

Indeed, evidence that Dunn's signature on the notice was false is neither necessary nor sufficient to prove that "no such directors' meeting actually was held" as alleged in count 18. Finally, proof that no director's meeting was held is wholly unnecessary to conviction on count 18, which in substance rests on the completely unrelated "nominee" allegation, as does the government's entire theory of the case. We note in this connection that the government has never taken the position that the loan papers were not adequately worded and signed so as to bind Frye *personally*, or that they were not adequate to bind his corporation, whether or not the directors' meeting in question actually occurred. And, Frye has pending in the district court a motion to strike the count 18 directors' meeting allegation on the grounds that it is immaterial, and ruling thereon has been postponed until trial.[43] Even if there were potential prejudice to Frye in this connection, it could be entirely obviated by striking from count 18 the allegation as to the directors' meeting—which would leave the plainly main thrust of that count wholly intact—and/or by excluding proof as to the verity of Dunn's signature on the notice. Dismissing the entire indictment prior to trial is plainly uncalled for.

Frye's other assertions of prejudice are equally unavailing.[44]

_____

[43]Frye's motion points out that the failure of the board to approve "could not, as a matter of law, have been raised as a defense by the borrower corporation," citing Texas Business Corporation Act Art. 2.04(B). The government has never disputed this, and has only argued that ruling should be deferred to trial.

[44]With respect to Frye's possible loss of notes of telephone conversations, Frye has referred to a memorandum by FHLB examiner Mims of a conversation (whether by telephone is not clear) with

57

Neither Frye nor Crouch has discharged the burden, especially heavy prior to trial, of showing that at trial they almost certainly will suffer substantial, actual prejudice by reason of the claimed undue delay in the return of the indictment. No more than potential, speculative prejudice is shown. To the extent that the district court found otherwise, its findings are not supported by the record and are clearly erroneous. While events at trial may demonstrate actual and substantial prejudice, at present Frye's and

---

Frye on July 23, 1986. However, before the magistrate judge, Frye's counsel took the position that this memorandum did not incriminate Frye, stating ". . . it nowhere says that Mike Frye was a nominee. It does say that Crouch and Ferguson put the whole deal together and he [Frye] didn't even have to go to Delta to sign the loan papers, which is all true." We have no assurance that Mims will testify as to what was said in this conversation in any manner inconsistent with this characterization of it by Frye's counsel.

Frye also introduced testimony by attorney Knoblock, who wrote letters in June 1986, purportedly on behalf of J.M.G. Financial, to Ferguson and Crouch. The letters were on the letterhead of another attorney with whom Knoblock officed. Knoblock, on being shown the letters, said he recognized the signature as his. He stated that he had represented J.M.G. "just for a brief period of time in 1986." He came to do so at the request of one Dan Croft, a self-employed mortgage broker. He wrote the letters following a meeting with Croft, and an attorney Knoblock did not know, who purported to represent Ferguson, "and some other individual that was representing J.M.G., I don't recall the name." He thinks Croft told him to write the letters. It must *not* have been Frye, because Knoblock testified he did not know Frye and had never met or seen him prior to testifying at the hearing before the magistrate judge. He did not know Crouch or who he was. He had met Ferguson. The letter to Crouch, at Crouch's law firm, concerned the Delta $3,950,000 loan to J.M.G. and states, "It was the understanding and information of JMG that this transaction was to facilitate a sale from Delta to an undisclosed purchaser, being Mr. R.B. Ferguson." Knoblock disposed of all his J.M.G. files in 1991. However, there is no evidence as to what those files might have contained. Knoblock did testify that he could not say he ever saw a file containing those letters. This testimony does not establish prejudice to Frye. It rather suggests that the government may have a difficult time tying Frye to the letters. How this will all play out at trial cannot now be reliably ascertained.

58

Crouch's claims are premature.

## CONCLUSION

We summarize our holdings.

We reject the *Townley* balancing test and hold that where an indictment is returned within the statute of limitations, preindictment delay does not violate due process unless that delay, in addition to prejudicing the accused, was intentionally brought about by the government for the purpose of gaining some tactical advantage over the accused in the contemplated prosecution or for some other bad faith purpose.  The district court having declined to make any such finding of bad faith,[45] accordingly erred in granting the motion to dismiss the indictment for preindictment delay.

We further hold that preindictment delay does not entitle the accused to dismissal of the indictment on due process grounds unless he demonstrates that the improper delay caused actual, substantial prejudice to his defense.  The requisite prejudice may not be presumed, rebuttably or otherwise, merely from the length of the delay, and the district court erred in holding to the contrary and in partially relying on presumed prejudice.  Moreover, because actual, substantial prejudice to the defense *at trial* is required, a showing of mere potential or possible trial prejudice does not suffice.  This means that dismissal on such a basis *prior to trial*

_____

[45]As noted, the district court correctly recognized that the record "will not justify" any such finding of bad faith.  However, because of discovery and evidentiary limitations imposed by the magistrate judge, the district court declined to rule out governmental bad faith.

59

will rarely (if ever) be appropriate.  In all but the clearest and most indisputable cases, the district court, even though inclined to grant such a motion, should nevertheless normally withhold doing so until after verdict, when the assessment of actual, substantial trial prejudice can more accurately be made.  Here the evidence is wholly insufficient to sustain a finding that Crouch and Frye *will*—not merely likely may—suffer actual and substantial prejudice to their defense *at trial*.  To the extent the district court found to the contrary, its findings are clearly erroneous.  "Events of the trial may demonstrate actual prejudice, but at the present time appellees' due process claims are speculative and premature." *Marion* at 466.

We accordingly reverse the district court's order dismissing the indictment and remand for further proceedings consistent herewith.[46]

REVERSED and REMANDED

---

[46]The district court shall not grant the motion to dismiss unless and until the events of trial demonstrate, and the court finds, actual and substantial trial prejudice to the defense as the result of improper and undue delay, and also finds, on the basis of adequate additional evidence, that the delay was intentionally brought about by the government for the purpose of gaining some tactical advantage over the defendants or for some other bad faith purpose.